833 F.2d 1011
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re CLC CORPORATION, Debtor.
CLC CORPORATION, Plaintiff-Appellant,
v.
CITIZENS BANK OF COOKEVILLE, TENNESSEE; R. Gene Cravens,
Jr.; and R. Gene Cravens, Defendants-Appellees.
 No. 86-6213.
 United States Court of Appeals, Sixth Circuit.
 Nov. 19, 1987.
 
 Before NATHANIEL R. JONES and BOGGS, Circuit Judges and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 CLC Corporation (CLC) appeals the order of the United States District Court reversing a bankruptcy court decision setting aside the lien of a deed of trust on some of its property as a fraudulent transfer under 11 U.S.C. Sec. 548(a)(2)(A) & (B)(i). The district court found that the bankruptcy court erred by holding that CLC did not benefit economically when it executed the deed of trust. Upon consideration of the parties' briefs and the record of the bankruptcy proceedings, we agree with the district court that the transfer was supported by adequate consideration, and accordingly, affirm the order of the district court.
 
 
 2
 * CLC is a wholly owned subsidiary of the Cumberland Thrift Corporation (CTC), an organization in the business of making consumer loans. Two-thirds of CTC is owned by R. Gene Cravens, Jr. The remaining one-third is owned by Ed Cline. Cline and Cravens constitute the board of directors for both CLC and CTC. Cline is President of both corporations.
 
 
 3
 CLC was created primarily for the purpose of holding legal title to the real property CTC uses for its offices. On its formation, CLC borrowed money from CTC in order to purchase the office properties, and subsequently secured the loan from CTC by executing three promissory notes with an aggregate amount of over $513,000.[1] After the purchases, CLC leased the properties back to CTC and received regular rental payments from its parent.
 
 
 4
 During spring 1984, CTC had difficulty meeting its financial obligations. This difficulty caused CTC to file a voluntary Chapter 11 bankruptcy petition on May 15, 1984.
 
 
 5
 Cravens testified during the bankruptcy proceedings on the deed of trust that he was aware of CTC's liquidity problems throughout 1984. He stated that in April 1984,
 
 
 6
 [i]n attempting to provide some liquidity for [CTC] my father and myself went to Mr. Miller at Citizens Bank to arrange a line of credit in my name for use in providing liquidity to [CTC]. At that time the line of credit was set up. No draws at that time but subsequently we drew money from Citizens Bank that went to [CTC].
 
 
 7
 Cravens and his father personally guaranteed the line of credit.
 
 
 8
 Between April 24, 1984 and May 15, 1984, the bank made five advances pursuant to the line of credit, totaling $245,969.94. Although the master note guaranteeing the debt stated that its purpose was "To secure to Citizens Bank of Cookeville, Tennessee, a $350,000.00 line of credit Agreement [sic] dated April 23, 1984, in favor of R. Gene Cravens, Jr.," all of the advances were used to satisfy debts owed to or by CTC, and all but the first advance were deposited directly into CTC's account at the bank.[2]
 
 
 9
 After the third advance, the bank told Cravens it was concerned about CTC's financial stability and refused to make any more advances without some security for the line of credit beyond the personal guarantees of Cravens and his father. On May 10, 1984, Cravens and Cline met as the board of directors of CTC and passed a resolution authorizing the company to borrow money from the bank and to secure the loan with a lien on CTC's real property, even though CLC was the formal owner of CTC's real property.
 
 
 10
 On May 14, 1984, CLC executed a deed of trust on the Crossville office property to the bank in order to secure the loans made to Cravens for the benefit of CTC. The deed listed both CLC and CTC as grantors of the deed and as recipients of the consideration for the deed. Cline signed the deed twice, once as President of CLC and once as President of CTC.
 
 
 11
 After receiving the deed of trust, the bank made two more advances on the line of credit before CTC filed for bankruptcy. On May 14 the bank advanced $45,000 and on May 15, the bank advanced $100,000.
 
 II
 
 12
 CLC filed for bankruptcy under Chapter 11 on January 11, 1985. Immediately after filing its petition, CLC filed suit as a Chapter 11 debtor-in-possession to set aside the deed of trust as a fraudulent transfer. CLC claimed it was insolvent on the date the transfer was made or that it was rendered insolvent by the transfer, and that it did not receive fair consideration for the transfer because it did not receive any of the advances from the bank.
 
 
 13
 The bank responded to CLC's complaint by asserting that the deed of trust was valid security for the last $145,000 advanced. It sought to enforce its secured interest for that amount of the total debt.
 
 
 14
 The bankruptcy court held a trial to resolve the claim. It found that apart from a small amount of cash and two company automobiles, the office properties were CLC's only assets, and that on the date the deed of trust was executed, the total value of CLC's assets was approximately $400,000. The bankruptcy court then found that CLC's three promissory notes to CTC formed the bulk of CLC's debt on the date of the deed's execution, with the corporation's total debt at that time being approximately $513,000.[3]
 
 
 15
 Because CLC's liabilities were greater than its assets, the bankruptcy court found that CLC was insolvent on the day it executed the deed. The court then determined that CLC did not directly benefit from the execution of the deed because it "received no direct funds or benefit from Citizens Bank or anyone." The court rejected the argument that CLC indirectly benefited from CTC's use of the line of credit on the ground that CLC and CTC were separate entities and were not operated as a joint enterprise. It found that the promissory notes represented a valid debt between CLC and its parent, but that there was "no evidence of a novation of any obligation of CLC Corporation by virtue of the transfer." On the basis of these findings, the bankruptcy court set aside the transfer.
 
 III
 
 16
 The bank, Cravens and his father appealed the bankruptcy court's decision to the district court. The district court concluded that CTC had incurred a debt to CLC when CLC provided collateral for the line of credit. The district court thus reversed the bankruptcy court's decision, holding that CLC did benefit economically from the transfer by receiving the equitable right to set off its debt to CTC for the office properties against CTC's debt to it for the collateral. The court held in the alternative that CLC received a partial novation of its office property debt to CTC in return for having executed the deed.
 
 
 17
 The district court also noted it would be inequitable to set the transfer aside because of a joint plan of reorganization filed by CLC and CTC. Under the plan, all remaining proceeds from CLC's liquidation inure to the benefit of CTC's creditors. The district court concluded that if the bank's claim was not satisfied, CTC's creditors would effectively receive both the original $145,000 advanced by the bank and $145,000 from CLC's liquidation that would otherwise be used to satisfy the bank's claim.
 
 IV
 
 18
 The bankruptcy court's findings of fact in a fraudulent conveyance proceeding may not be set aside on appeal unless they are clearly erroneous. Bankruptcy Rule 8013; accord 28 U.S.C. Sec. 157(b)(2)(H); In re Martin, 761 F.2d 1163, 1165-66 (6th Cir.1985). On appeal of the bankruptcy court's judgment, a district or appellate court may affirm, modify, or reverse the judgment, or remand for further proceedings. See Bankruptcy Rule 8013; Coman v. Phillips, 804 F.2d 930, 932 (6th Cir.1986).
 
 
 19
 The execution of the deed of trust was a fraudulent transfer only if CLC both received less than a reasonably equivalent value in exchange for the deed and was insolvent on the date that the deed was executed, or became insolvent as a result of the execution of the deed. 11 U.S.C. Sec. 548(a)(2)(A) & (B)(i). Section 548 of the Bankruptcy Code provides that " 'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor ..." 11 U.S.C. Sec. 548(d)(2)(A). CLC, as debtor-in-possession, has the burden of proving it did not receive a reasonable value in return for its execution of the deed of trust. See 4 Collier on Bankruptcy p 548.10 (15th ed. 1985).
 
 
 20
 We agree with the district court's conclusion that CLC benefited from the transfer by receiving the right to set off its debt to CTC for the office properties against the debt CTC incurred to CLC when CLC provided collateral for the line of credit benefiting CTC.
 
 
 21
 Although payment or assumption of a third party's debt by a bankruptcy debtor usually is deemed to be a fraudulent conveyance, see e.g. In re B-F Building Corp., 312 F.2d 691, 694 (6th Cir.1963) (listing citations), courts can look beyond the face of a transfer to determine if the debtor benefited from the transfer in a way that is not apparent on the face of the transaction. See Rubin v. Manufacturers Hanover Trust, 661 F.2d 979 (2d Cir.1981); accord McNellis v. Raymond, 287 F.Supp. 232, 238-39 (N.D.N.Y.1968), aff'd in relevant part, 420 F.2d 51 (2d Cir.1970); Mayo v. Pioneer Bank & Trust Co., 270 F.2d 823 (5th Cir.1959), cert. denied, 362 U.S. 962 (1960).
 
 
 22
 The bankruptcy court's factual findings support our conclusion that CTC and CLC were the real parties involved in the bank's advances and the execution of the deed of trust. The bankruptcy court essentially found that Cravens used the advances to benefit CTC when it noted, while itemizing the five advances made by the bank to Cravens, that the proceeds of the first advance was used "to purchase the savings account of a depositor of [CTC];" that another advance "was used to pay a portion of a note owed ... to CTC Corporation;" and that yet another advance was "used to pay the 'bounced checks' of CTC Corporation which were issued to satisfy certain depositors in CTC Corporation who were demanding the withdrawal of their funds from CTC Corporation."
 
 
 23
 The bankruptcy court erred by failing to recognize that as the true beneficiary of the line of credit, CTC was indebted to CLC for securing that line of credit. The court should have concluded that because CLC was insolvent on the day it executed the deed of trust, CLC had the right to claim an immediate set off of its debt to CTC for the office properties against CTC's newly created debt to CLC for the collateral. See Nashville Trust Co. v. Fourth National Bank, 18 S.W. 822 (1892); 80 C.J.S. Set-off and Counterclaim Sec. 29. Thus, the value CLC received in return for its execution of the deed was the satisfaction of its antecedent debt to CTC for the office properties, and consequently, the deed of trust was not a fraudulent conveyance.
 
 V
 
 24
 We emphasize that our decision is based on the peculiar facts of this case. CTC and the bank are CLC's only unpaid creditors. Of the original $245,969.94 advanced pursuant to the line of credit, only approximately $8500 plus interest remains unpaid at this time.[4] The bank asserts its lien only against the last $145,000 advanced in May 1984. The debtors' joint plan of reorganization prevents prejudice to CTC's creditors from enforcing the bank's lien because they will receive all excess proceeds from CLC's liquidation once the bank's $145,000 claim is satisfied. Accordingly, for these reasons the decision of the district court upholding the transfer is AFFIRMED.
 
 
 
 [1]
 CLC owned two office properties, one located in Jamestown, Tennessee and the other located in Crossville, Tennessee. The Jamestown property is not in issue, as only the Crossville property was conveyed in the deed of trust. CLC owned the Crossville property by virtue of two warranty deeds, one of which was conveyed to CLC from CTC in 1976. The other deed was conveyed to CLC from unrelated third parties in 1978. Although the record is incomplete, it appears that CTC loaned CLC the funds used to purchase the 1978 deed and that both the 1976 and 1978 loans were secured by the promissory notes CLC executed to CTC
 It also is unclear whether CLC concurrently executed the promissory notes to CTC when it received the loans from CTC. There are two notes in the record dated December 1983, which, according to Cravens's testimony in a deposition, represented the loans used to purchase the Crossville and Jamestown properties. Cravens indicated that these December 1983 notes might have been the result of refinancing the terms of the 1976 and, presumably, 1978 loans, but did not respond when asked if notes securing the entire debt had been executed prior to 1983. The President of CLC at the time of the bankruptcy trial, Larry Pollock, testified that on the date the deed of trust was executed, CLC's total debt to CTC was secured by three promissory notes.
 
 
 [2]
 The first advance was a $25,000 cashier's check payable to the order of R. Gene Cravens, Jr. Cravens testified at the bankruptcy trial that he used that advance to return the principal amount owed an investor of CTC and that accompanying his payment was a check to the investor issued by CTC for the interest owed him. The second and third advances were used to pay part of a debt owed CTC by JLT Auto Sales, another subsidiary of CTC owned in one-third shares by Cravens, his father and Cline. The last two advances were used to cover overdrawn checks CTC had issued to its investors and to cover additional checks CTC issued after receiving the last advances
 
 
 [3]
 Although the bankruptcy court's findings state that the total amount of CLC's debt on the date of the transfer was a little over $513,000, the record indicates that that figure represents the amount of the aggregate debt CLC owed CTC, while CLC's total debt, which included its debt to CTC as well as state and local taxes due, was approximately $516,000 at the time it executed the deed of trust
 
 
 [4]
 Two payments have been made on the total amount advanced: on July 5, 1984, Cravens paid $75,969.94 on the principal and $5,135.35 in interest; on June 3, 1985, the proceeds of a certificate of deposit from Carolyn Cravens, the wife of Cravens's father, were used to pay $161,522.66 on the principal and $7,898.58 in interest