**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0037n.06
Filed: January 10, 2007

**Nos. 05-4224, 05-4265**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| WILLARD EDGAR CONGROVE, Debtor | ) | |
| | ) | |
| BARBARA ANN CONGROVE, Debtor | ) | |
| _____ | ) | |
| | ) | |
| WILLARD EDGAR CONGROVE; BARBARA | ) | |
| ANN CONGROVE, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES |
| Plaintiffs-Appellants, | ) | BANKRUPTCY APPELLATE |
| Cross-Appellees, | ) | PANEL FOR THE SIXTH |
| | ) | CIRCUIT |
| v. | ) | |
| | ) | |
| MCDONALD'S CORPORATION, | ) | |
| | ) | |
| Defendant-Appellant, | ) | |
| Cross-Appellant. | ) | |
| _____ | ) | |

BEFORE: SUTTON and GRIFFIN, Circuit Judges; and COHN, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiffs William Congrove and Barbara Ann Congrove (collectively "Congrove") appeal

an order of the Bankruptcy Appellate Panel ("BAP") for the Sixth Circuit affirming in part, reversing

_____

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of
Michigan, sitting by designation.

- 1 -

in part, and remanding the Bankruptcy Court's ("BC") decision. Defendant McDonald's Corporation ("McDonald's") cross-appeals the BAP's decision.

Congrove originally filed a bankruptcy action in the Southern District of Ohio. He later filed an action alleging that his transfers of two McDonald's franchises back to McDonald's constituted fraudulent conveyances under 11 U.S.C. § 548(a)(1)(B) and comparable Ohio law, impermissible preferences under 11 U.S.C. § 547(b)(4)(B) and comparable Ohio law, transfers to insiders in contemplation of bankruptcy prohibited by Ohio law, and unjust enrichment as defined by Ohio law. Both parties moved for summary judgment, and the BC granted summary judgment in favor of McDonald's on all counts of Congrove's complaint. Thereafter, the BAP affirmed in part, reversed in part, and remanded.

These timely appeals followed. For the following reasons, we affirm the disposition of the BAP.

## I.

This litigation arises out of Congrove's former ownership of two McDonald's franchises.[1] The franchise agreement for the first restaurant, executed in 1990, contained provisions that (1) authorized Congrove to use "those tangible assets normally required for operation of a McDonald's restaurant" (i.e., signs, fixtures, and equipment), with an option to purchase, which (if exercised) would extend the term of the agreement to July 31, 2004; (2) gave Congrove the right to occupy the

---

[1]The facts in this case are largely uncontested, and, thus, we liberally borrow from the BAP's recitation of the facts.

restaurant buildings; and (3) licensed Congrove to use the trademarks and service marks of McDonald's. The franchise was also evidenced by a license agreement and a lease, which provided that McDonald's could unilaterally terminate those agreements upon a default under either the license agreement or the lease. Congrove exercised the option to purchase the "personal property" portion of the assets in 1990 and paid McDonald's $700,000. On January 1, 1998, the franchise agreement was amended to include a second restaurant, the tangible personal property of which Congrove acquired outright for $100,095.

On February 2, 2001, McDonald's issued a memorandum finding Congrove's financial position critical and suggesting that the total value of the two restaurants was $850,000 (later adjusted to $700,000[2]). Congrove and McDonald's began negotiating the terms of a franchise termination agreement. During the course of the negotiations between the parties, three options were presented by McDonald's to Congrove to settle their mutual claims: (1) McDonald's could purchase both restaurants for $700,000 and assist Congrove in entering into an agreement with his creditors; (2) Congrove could plunge into bankruptcy and let the chips fall where they may; or (3) Congrove could voluntarily terminate his franchises and then have McDonald's "work [ ] with his creditors in an informal manner." After consulting with his financial advisors, Congrove chose the last of these options, hoping to minimize his tax burdens in so doing.

---

[2]McDonald's notes that the eventual valuation of $700,000 was disputed in the BC and was not conclusively decided. This fact is not material to our disposition of the appeal.

The parties executed an agreement on March 28, 2001 (the "Franchise Termination Agreement"). The Franchise Termination Agreement terminated both franchises and licenses, conveyed all restaurant assets to McDonald's, and provided that McDonald's would not assume or forgive any of Congrove's liabilities. Under the express terms of the Franchise Termination Agreement, McDonald's had no duty to pay any of Congrove's debts. A provision for the payment of the debts that had been present in the first draft of the agreement was not in the final draft. The executed Franchise Termination Agreement included an integration provision, stating that the agreement superseded "all prior and contemporaneous, oral or written, agreements or understandings of the parties" and that there were "no representations, warranties or other inducements which have been made other than those specifically set forth in this Agreement."

The Franchise Termination Agreement did not provide for the payment of any consideration to Congrove in exchange for the termination of the franchises or the conveyance to McDonald's of the restaurant assets. At the time the Franchise Termination Agreement was executed, Congrove's liabilities, including a debt to McDonald's in the amount of $135,770.86, totaled more than $1.5 million. After the execution of the agreement, McDonald's paid a total of $768,060.38 of Congrove's debts, including debt to McDonald's, taxes, utilities, equipment rentals, and previously dishonored paychecks.

After the Franchise Termination Agreement was executed and McDonald's paid obligations of Congrove, he and his spouse, Barbara Congrove, filed a Chapter 11 petition on August 10, 2001. Congrove then filed a complaint, later amended, alleging that his transfers of the franchises and

stores back to McDonald's constituted fraudulent conveyances under 11 U.S.C. § 548(a)(1)(B) and comparable Ohio law, illegal preferences under 11 U.S.C. § 547(b)(4)(B) and comparable Ohio law, transfers to insiders in contemplation of bankruptcy prohibited by Ohio law, and unjust enrichment as defined under Ohio law. In due course, both parties moved for summary judgment, and the BC granted summary judgment to McDonald's on all counts of Congrove's complaint.

Thereafter, Congrove appealed to the BAP, which affirmed the BC as to Counts One, Two, Three, Five, and Six of the complaint. The BAP reversed with respect to Count Four and remanded for the BC to address whether the termination of the Franchise Agreement constituted a transfer for purposes of 11 U.S.C. § 544(a) and OHIO REV. CODE § 1313.56. Both Congrove and McDonald's appealed the decision of the BAP.

This court reviews the bankruptcy court's findings of fact under the clearly erroneous standard and reviews the bankruptcy court's conclusions of law under the de novo standard. *In re The Gibson Group, Inc.*, 66 F.3d 1436, 1440 (6th Cir. 1995). "'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

II.

First, Congrove contends that the BC erred in finding that McDonald's gave "reasonable equivalent value" for purposes of 11 U.S.C. § 1336.04(A)(2) and OHIO REV. CODE § 1336.05(A),

because McDonald's was not required to pay any of Congrove's creditors pursuant to the Franchise Termination Agreement, nor did the parties have any additional agreement regarding such payment. Instead, Congrove argues, any payments that McDonald's made were made exclusively for its own benefit, in essence, "volunteered payments." Accordingly, Congrove urges this court to reverse the holdings of the BAP and BC.

In order for the $768,060.38 that McDonald's paid of Congrove's debts to constitute "reasonably equivalent value" for the franchises valued at $700,000, there must be a determination that: (1) value was given, (2) in exchange for the transfers, and (3) what was transferred was reasonably equivalent to what was received. *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel Co.*), 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001); *cf.* 5 Collier on Bankruptcy ¶ 548.05[1][b] (15th ed. rev. 2005) ("The statute has two components to the reasonably equivalent value analysis. The first is whether sufficient value was received. The second is whether the value was received 'in exchange for' the transfer that was made or obligation that was incurred.").

Both the BC and the BAP majority determined that there was no genuine issue that Congrove received reasonably equivalent value in exchange for the transfers effected by the Franchise Termination Agreement. Thus, the courts granted summary judgment to McDonald's on both Counts One and Two. We agree.

    A.    <u>Value.</u>

The applicable portion of the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). The BAP noted correctly that "reasonably equivalent" is not defined by the Bankruptcy Code, but focus has been placed upon the consideration received by the debtor, not the value given by the transferee:

> [T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

*Harman v. First Am. Bank of Md.* (*In re Jeffrey Bigelow Design Group, Inc.*), 956 F.2d 479, 484 (4th Cir. 1992). "[I]t is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." *Butler Aviation Int'l, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1125-26 (5th Cir. 1993). The BAP further cited this court's application of Ohio law in this regard, recounting:

> In assessing whether a challenged transfer is supported by reasonably equivalent value, courts generally compare the value of the property transferred with the value of that received in exchange for the transfer. . . .
>
> . . . .
>
> Thus, the test used to determine whether a transfer was supported by reasonably equivalent value focuses on whether there is a reasonable equivalence between the value of property surrendered and that which was received in exchange.

*Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 707-08 (6th Cir. 1999).

Pursuant to both the Bankruptcy Code and Ohio law, the "debtor-in-possession . . . has the burden of proving it did not receive a reasonable value in return for [the transfer]," *CLC Corp. v. Citizens Bank* (*In re CLC Corp.*), No. 86-6213, 833 F.2d 1011 (Table), 1987 WL 38995, at *3 (6th Cir. Nov. 19, 1987) (citation omitted); *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio*, 524 N.E.2d 915, 918 (Ohio Ct. App. 1987) ("[I]n an action to set aside a conveyance as fraudulent, the burden of proof rests upon the plaintiff to prove the existence of fraud"). Thus, the burden of proving that the payments were not "reasonably equivalent value" is on Congrove.

B.     In Exchange for.

On appeal, Congrove reasserts the arguments he made to the BC and the BAP, namely, that any payments McDonald's made were "volunteer" payments, payments not made pursuant to any obligation or the terms of the Franchise Termination Agreement, but made solely to maintain the restaurants. Thus, he contends, McDonald's did not actually put forth any value "in exchange for" the transfers. The "volunteer doctrine" has been utilized to hold that parties who voluntarily make payments do so at their own peril and risk that they will not be "credited" for such payments. *See Farm Bureau Mut. Auto Ins. Co. v. Buckeye Union Cas. Co.,* 67 N.E.2d 906, 911 (Ohio 1946). Congrove's primary position is that, because the Franchise Termination Agreement did not obligate it to pay the debts in question, and because the agreement denied all other contemporaneous agreements, McDonald's payments should be considered "volunteer payments."

We disagree and concur with the BC and the BAP that McDonald's payments of $768,060.38 constituted "value" for purposes of bankruptcy law, and the "volunteer" defense is inapplicable here.

A "volunteer" has generally been defined by the Ohio Supreme Court as a party with "no right or interest of his own to protect, and acts without obligation, moral or legal, and without being requested by anyone liable on the obligation." *Aetna Cas. & Sur. Co. v. Buckeye Union Cas. Co.*, 105 N.E.2d 568, 572 (Ohio 1952) (quotation omitted); *United Nat'l Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914, 922 (6th Cir. 2002) ("The volunteer defense applies if the paying party has not been asked for the payment."). Here, the BC and the BAP found persuasive the extensive negotiations between McDonald's and Congrove, the potential moral obligation of McDonald's to honor its alleged promise to pay the debt, and that it intended to protect its own interests by paying Congrove's debts. Thus, McDonald's was not a "volunteer."

Next, the BAP majority stated:

> During the course of the negotiations between the parties leading to the Franchise Termination Agreement, several options were presented by McDonald's to Congrove to settle their mutual claims. After consulting with his financial advisors, Congrove chose to terminate his franchise agreements with no written agreement with McDonald's concerning his creditors. Congrove hoped to minimize his tax burden by doing so. An *express* agreement by McDonald's to pay the claims of the Congrove's [sic] creditors to the extent of $700,000, which appeared in a draft of the Franchise Termination Agreement, was omitted from the final version of the Franchise Termination Agreement. Thus, McDonald's had no duty under the express terms of the Franchise Termination Agreement to pay any of Congrove's debts. The bankruptcy court concluded, however, that "[e]ssentially, the Debtor and McDonald's had a side agreement that McDonald's would pay down certain of the Debtor's obligations outside the Franchise Termination Agreement."

Instead, Congrove urges us to adopt the BAP dissent's position that summary judgment was not appropriate for either party on Counts One or Two, but instead, a genuine issue of fact remained

with respect to whether the value was given "in exchange for" the transfer. We agree with the BAP

majority's analysis, which stated:

> Equally unpersuasive is Congrove's argument that any verbal agreement regarding McDonald's paying Congrove's debts is unenforceable due to the integration or merger clause set forth in the Franchise Termination Agreement. It is irrelevant whether the oral agreement is enforceable or even whether there was an agreement to pay the debts at all. The only requirement is that the value have been given in exchange for the transfers to McDonald's effected by the Franchise Termination Agreement. The fact that the debt-payment provision was removed from the written agreement (at Congrove's request) is of no consequence in light of the fact that the provision was, in fact, performed. There is simply no question that Congrove's debts were paid "in exchange for" the transfers to McDonald's, whether or not Congrove could have compelled the payments, and irrespective of whether McDonald's was motivated by self-interest or Congrove's interests.
>
> . . . .
>
> Congrove introduced no evidence that the debts paid by McDonald's were not paid contemporaneously with the execution of the Franchise Termination Agreement. Moreover, the *Chomakos* case's holding was made in the context of rejecting the argument that the court should consider post-transfer changes in value of the property given in exchange for the transfer. Here, there is no contention that the value given by McDonald's (the payment of Congrove's debts) changed after the value was given (the debts were paid).

Bolstering this conclusion is the BC's specific finding of fact that:

> Prior to the execution of the Franchise Termination Agreement, Debtor and McDonald's conducted negotiations in an attempt to enter into an agreement that would have provided $700,000 to the Debtor or to the Debtor's creditors directly. The agreement was not finalized because of the Debtor's concerns regarding adverse tax consequences. McDonald's had discussions with the Debtor's accountant on the issue. The provisions in the previous draft of the Franchise Termination Agreement, which would have expressly required McDonald's to pay $700,000.00 to Debtor's creditors, was removed at the Debtor's request because of concern of adverse tax consequences.

- 10 -

This court is "bound by the bankruptcy courts' findings of fact unless they are clearly erroneous." *Meoli v. Citicorp Trust Bank* (*In re Oswalt*), 444 F.3d 524, 528 n.1 (6th Cir. 2006) (citing *Investors Credit Corp. v. Batie* (*In re Batie*), 995 F.2d 85, 88 (6th Cir. 1993)). Congrove has not proffered sufficient evidence that this finding of fact is clearly erroneous on appeal, and, thus, we conclude that McDonald's payments were "reasonably equivalent value" for purposes of whether fraudulent transfer existed and affirm the analysis and conclusion reached by the BC and BAP.

III.

Count Three of the complaint sought to avoid the Franchise Termination Agreement as a fraudulent transfer under § 1336.05(B) of the Ohio Revised Code and § 544 of the Bankruptcy Code. Count Five of the complaint sought to avoid the agreement as a preferential transfer under § 547(b) of the Bankruptcy Code.

Section 1336.05(B) provides:

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the transfer was made to or the obligation was incurred with respect to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

OHIO REV. CODE § 1336.05(B). Pursuant to federal law, a transfer made more than ninety days but less than one year before the bankruptcy petition was filed may be avoided under that statute only if the transfer was made to or for the benefit of an "insider." 11 U.S.C. § 547(b)(4)(B). Congrove's bankruptcy petition was filed outside of the ninety-day window. Thus, to establish the illegality of

the transfers under both counts, Congrove must establish that McDonald's was an "insider" for purposes of these statutes.

The BAP accurately set forth the definition of "insider" with respect to the applicable law. Ohio law states that:

(G) "Insider" includes all of the following:

(1) If the debtor is an individual, any of the following:

(a) A relative of the debtor or of a general partner of the debtor;

(b) A partnership in which the debtor is a general partner;

(c) A general partner in a partnership described in division (G)(1)(b) of this section;

(d) A corporation of which the debtor is a director, officer, or person in control.

. . . .

(4) An affiliate, or an insider of an affiliate as if the affiliate were the debtor.

OHIO REV. CODE § 1336.01(G).  The definition of the Bankruptcy Code is essentially the same.  *See* 11 U.S.C. § 101(31).

The BC and the BAP both held that McDonald's did not qualify as an "insider" pursuant to these definitions.  Specifically, the courts held that McDonald's was not an "affiliate," nor did it have a "sufficiently close relationship" with Congrove that would necessitate its conduct being subjected to closer scrutiny than anyone dealing at arm's length.

On appeal, Congrove again re-raises the arguments it proffered below; namely, that McDonald's was an "affiliate," and therefore an "insider," and the franchiser/franchisee relationship

between the two made their dealings those of "insiders." We decline to accept this invitation and,

instead, adopt the analysis and conclusion reached by the BAP.

IV.

Count Four of the complaint sought to avoid the Franchise Termination Agreement as a

preferential transfer under Ohio Revised Code § 1313.56. Section 1313.56 provides in pertinent

part:

> A sale, conveyance, transfer, mortgage, or assignment, made in trust or otherwise by
> a debtor, and every judgment suffered by him against himself in contemplation of
> insolvency and with a design to prefer one or more creditors to the exclusion in
> whole or in part of others, and a sale, conveyance, transfer, mortgage, or assignment
> made, or judgment procured by him to be rendered, in any manner, with intent to
> hinder, delay, or defraud creditors, is void as to creditors of such debtor at the suit of
> any creditor.

*Id.* The BC concluded that Congrove's reliance upon this section was "uniquely confounding,"

because he failed to allege that, at the time he made the contested transfer, he contemplated

insolvency. Further, Congrove had not alleged facts sufficient to withstand summary judgment on

his fraudulent-conveyance claim. *Id.* The BAP disagreed, concluding that Congrove's complaint

and amended complaint did contain such an allegation, and the allegations were sufficient to

withstand summary judgment. Further, the BAP held that the BC failed to consider that § 1313.56

potentially provided for two independent causes of action – one for fraudulent conveyance and

another for preferential transfer. Accordingly, the BAP concluded that Congrove's allegations

sufficed to survive summary judgment with respect to these causes of action. The BAP carefully

declined to rule on the legal issue of "whether the termination of a franchise agreement constitutes

a 'transfer,'" but remanded to the BC for further factual determinations as to whether Congrove

satisfied the four elements of a "transfer" pursuant to § 1313.56. McDonald's has cross-appealed

this portion of the BAP decision.

We agree and, accordingly, adopt the analysis and holding of the BAP.

V.

Count Six of Congrove's complaint alleged that McDonald's was unjustly enriched by the

Franchise Termination Agreement. To recover under an unjust enrichment theory in Ohio, three

elements are required: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by

the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances

where it would be unjust to do so without payment ('unjust enrichment')." *Hambleton v. R.G. Barry

Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984) (quoting *Hummel v. Hummel*, 14 N.E.2d 923, 925-26

(Ohio 1938)) (internal quotation marks omitted). Both the BC and the BAP concluded that

Congrove had not demonstrated these elements. Specifically, the BAP stated:

> Congrove contends that "McDonald's received a benefit in the form of the Transfer
> worth $700,000.00 for which it paid no consideration." However, Congrove clearly
> *did* receive value in exchange for the assets transferred to McDonald's, namely the
> payment of debts on his behalf totaling $768,060.38. Thus, while Congrove
> conferred a benefit on McDonald's and McDonald's had knowledge of that benefit,
> retention of the benefit without additional payment would not be unjust under the
> circumstances.

On appeal, Congrove proffers that, with respect to the final element, it would be "unjust to

allow McDonald's to retain the value it received as a result of the Transfer as it unjustly benefitted

[sic] by its relationship with Congrove to the detriment of Congrove's other creditors." In short,

- 14 -

Congrove asserts general equity arguments.  While it is possible that McDonald's payments for terminating the transfers were in violation of bankruptcy preference laws, this cause of action is inappropriate because, as the BAP stated, Congrove benefitted from the transaction.  Accordingly, we affirm.

VI.

Finally, Congrove argues that the BC's grant of summary judgment was improper because it exceeded the scope of the relief sought by the cross-motion for summary judgment filed by McDonald's.  Arguing before the BAP, Congrove contended that "the only relief requested by Defendant in its Cross Motion for Summary Judgment was a determination that the pre-petition termination of the Franchise Agreement was not a transfer as defined in the Bankruptcy Code, that Plaintiff could not utilize 11 U.S.C. § 365 to reinstate the Franchise Agreement, and that the enforcement of a contract cannot serve as the basis of a claim for unjust enrichment."  The BAP disagreed, noting that "McDonald's sought 'summary judgment in its favor and against Plaintiff for the reason that no genuine issue of material facts exist and Defendant is entitled to judgment as a matter of law.'"  Accordingly, the BAP concluded that summary judgment was an appropriate resolution by the BC.

On appeal, Congrove contends that "[t]he Bankruptcy Court may not grant summary judgment on grounds not urged by the moving party without giving adequate notice to the nonmoving party, unless there is no prejudice to the nonmoving party."  McDonald's contends that its motion for summary judgment "plainly sought judgment on each count of Congrove's Amended

Complaint. . . . McDonald's Corporation did not file a motion for partial summary judgment nor did McDonald's Corporation, as Congrove alleges, merely seek determinations on specific legal issues."

Sua sponte grants of summary judgment are generally disfavored. *Employers Ins. of Wausau v. Petroleum Specialities, Inc*., 69 F.3d 98, 105 (6th Cir. 1995). Nonetheless, "'district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). Here, Congrove had the burden of establishing his claims. The parties filed cross-motions for summary judgment on these claims. Thus, Congrove's argument that he did not have notice is not tenable. Congrove's general argument that he needed to conduct additional discovery is likewise unpersuasive; he does not identify any discovery that needed to be conducted or cite the facts that he hoped to recover with additional discovery. Accordingly, we affirm the holding of the BC and BAP.

## VII.

For the forgoing reasons, we AFFIRM the holdings of the BAP, affirming the BC as to Counts One, Two, Three, Five, and Six of the complaint; reversing as to Count Four of the complaint; and remanding for further proceedings.