T.C. Memo. 2017-217

UNITED STATES TAX COURT

BILLY F. HAWK, JR., GST NON-EXEMPT MARITAL TRUST, TRUSTEE, TRANSFEREE, NANCY SUE HAWK AND REGIONS BANK, CO-TRUSTEES, ET AL.,[1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 30024-09, 30025-09, 30026-09, 30515-09.

Filed November 6, 2017.

Dale C. Allen, J. Eric Butler, Ashley H. Morgan, and Katherine S. Goodner, for petitioners in docket Nos. 30024-09, 30025-09, and 30026-09.

John P. Konvalinka and William L. Konvalinka, for petitioner in docket No. 30515-09.

Rebecca Dance Harris and W. Benjamin McClendon, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith: Estate of Billy F. Hawk, Jr., Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Executors, docket No. 30025-09; Billy F. Hawk, Jr., GST Exempt Marital Trust, Trustee, Transferee, Nancy Sue Hawk and Regions Bank, Co-Trustees, docket No. 30026-09; and Nancy Sue Hawk, Transferee, docket No. 30515-09.

**[*2]**      MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  In four statutory notices of liability, respondent determined that the Estate of Billy F. Hawk, Jr. (estate), the Billy F. Hawk, Jr., GST Exempt Marital Trust (exempt trust), the Billy F. Hawk, Jr., GST Non-Exempt Marital Trust (nonexempt trust), and Nancy Sue Hawk (Mrs. Hawk) are liable as transferees for assessed Federal income tax, a penalty, and interest of Holiday Bowl, Inc. (Holiday Bowl).[2]  The Court has issued two prior opinions in these cases:  T.C. Memo. 2012-154, denying petitioners' motion for summary judgment and respondent's motion to stay the instant proceedings, and T.C. Memo. 2012-259, denying petitioners' motion for reconsideration.

The issue for decision is whether petitioners are liable as transferees under section 6901 for Holiday Bowl's unpaid 2003 Federal income tax, penalty, and interest.[3]  We find that petitioners are liable to the extent set out herein.

---

[2]For simplicity we refer to Holiday Bowl's former shareholders, the estate and Mrs. Hawk, as petitioners.  The marital trusts are successive transferees from the estate.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]   At the time the petitions were filed, Mrs. Hawk resided in Tennessee.[4]  Mrs. Hawk and AmSouth Bank (now Regions Bank) were coexecutors of the estate and cotrustees of the two marital trusts.  At the time the petitions were filed, Regions Bank had a mailing address in Tennessee.  Mrs. Hawk's husband, Billy F. Hawk, Jr., died in February 2000.  At the time of his death, Mr. Hawk owned and managed two bowling alleys in Tennessee through Holiday Bowl.  He had been in the bowling alley business for approximately 40 years.  At the time of the transactions at issue in these cases, the estate owned 81.25% of Holiday Bowl, including 100% of the voting stock; Mrs. Hawk owned the remaining 18.75%.

Respondent's assertion of transferee liability arises from a series of transactions involving Holiday Bowl that occurred after Mr. Hawk's death.  First, Holiday Bowl sold its primary assets, the two bowling alleys, to an unrelated third party.  Next, Holiday Bowl distributed unimproved real property to the estate and Mrs. Hawk in a stock redemption.  The same day as the redemption, the estate and Mrs. Hawk sold their remaining shares to an unrelated third party, MidCoast Investment, Inc., and its related entities (collectively MidCoast), a familiar entity in recent transferee liability cases before this Court (MidCoast transaction).

---

[4]Some of the facts have been stipulated, and the stipulated facts are incorporated by this reference.  All amounts are rounded to the nearest dollar.

**[*4]** MidCoast immediately resold the stock to yet another third party. The estate subsequently distributed the proceeds from the MidCoast transaction to the two marital trusts. Petitioners saved approximately $300,000 in tax by engaging in the MidCoast transaction. The tax savings represent an approximately 15% premium above Holiday Bowl's book value. Respondent now seeks to recover approximately $1.3 million in tax and a penalty plus interest from petitioners.

I.      Decision To Sell the Bowling Alleys

After her husband's death, Mrs. Hawk served as Holiday Bowl's president and sole director, receiving compensation of $200,000 in 2002 and $214,000 in 2003. Mrs. Hawk depended on her two sons, William and Robert, to operate the bowling alleys. She had no business experience. During her nearly 50-year marriage, she was a mother and housewife. She had never helped her husband manage the bowling alleys. Before Mr. Hawk's death, neither son had been involved with the bowling alleys' management because of discord within the family. By 2002, two years after Mr. Hawk's death, the family disagreed over how to operate the bowling alleys. Mrs. Hawk decided to sell them because she did not want to rely on anyone to run them and lacked the experience to manage them herself. Mrs. Hawk did not want to sell the bowling alleys to a family member because of the disagreement within the family. AmSouth Bank

[*5] (AmSouth), as coexecutor of the estate, was not involved in the decision to sell the bowling alleys, but AmSouth's trust officer assigned to the estate agreed with Mrs. Hawk's decision to sell because it would diversify the estate's holdings. Holiday Bowl relied on Mr. Hawk's longtime attorney Wayne Thomas of Chambliss, Bahner, & Stophel, P.C. (Chambliss Bahner), for advice on the asset sale. Mr. Thomas also represented the estate in probate. Chambliss Bahner is one of the largest law firms in Chattanooga, Tennessee. Holiday Bowl also retained Dan Johnson of the accounting firm Johnson, Hickey & Murchinson, P.C. (Johnson Hickey), to assist with the asset sale.

In November 2002 Mrs. Hawk hired a broker, Sandy Hansell, who specialized in buying and selling bowling alleys nationwide. Mr. Hansell's engagement letter acknowledged Mrs. Hawk's instruction not to sell to a family member. It also specified that the transaction would be structured as an asset sale. There was no explanation for the decision to structure the transaction as an asset sale. Holiday Bowl also owned two parcels of real property: (1) unimproved real property on Snow Hill Road in Hamilton County, Tennessee (Snow Hill Road) that the family used as part of a horse farm and wanted to retain and (2) a building leased as a Russell Stover Candy store that was offered for sale separately from the bowling alleys. The advisers expected that Holiday Bowl would be liquidated

[*6] after the asset sale; however, no formal action to liquidate was taken. When Mrs. Hawk decided to sell the bowling alleys, petitioners and their advisers did not raise any concerns about the tax implications of the asset sale or seek out any strategies to reduce Holiday Bowl's income tax on the gain from the asset sale.

In December 2002 the Hawks' son William instituted legal action in chancery court objecting to the sale of the bowling alleys because it restricted his ability to purchase them. He also sought to remove his mother as coexecutor of the estate. By March 2003 Holiday Bowl had received several offers for the bowling alleys and had accepted an offer from New England Bowl, Inc., and Corley Family Realty, L.P. (Corley family), for $6.2 million. In April 2003 the chancery court issued an order prohibiting the sale to the Corley family, finding that Mrs. Hawk had breached her fiduciary duties by restricting the potential purchasers. The chancery court held that the estate could offer the bowling alleys for sale on terms that did not exclude any potential purchaser but did not remove Mrs. Hawk as coexecutor. Holiday Bowl reoffered the bowling alleys for sale in late May 2003 and received four offers, including a second offer from the Corley family for $6.5 million and a lower offer from William. In June 2003 Holiday Bowl accepted the Corley family's offer, and the asset sale closed on July 1, 2003. The Corley family also purchased the Russell Stover Candy store property.

[*7] Holiday Bowl received net proceeds of approximately $4 million, realized gain of approximately $2.7 million, and owed approximately $1 million in Federal income tax. After the asset sale, Holiday Bowl's assets consisted of cash, prepaid taxes, and Snow Hill Road. It had no operating assets and ceased to engage in any business activity.

II.     MidCoast Proposal To Purchase Holiday Bowl Stock

Petitioners first learned about MidCoast from Mr. Hansell in March 2003 shortly after Holiday Bowl had accepted the Corley family's first purchase offer. Mr. Hansell presented petitioners' advisers with the idea of selling Holiday Bowl's stock to MidCoast after the asset sale as an alternative to a liquidating distribution of the sale proceeds. Mr. Hansell is unrelated to petitioners' attorneys and accountants. Mr. Hansell explained that MidCoast would pay a premium for the stock because it would use loss carryforwards from its assets recovery business to avoid the gain realized on the asset sale and would pass a portion of the tax saving on to petitioners. He admitted that he did not fully understand MidCoast's tax strategy and wrote: "I know the old adage that, if it seems too good to be true, it probably is. But maybe this is the exception." At that time none of Holiday Bowl's attorneys or accountants had heard of MidCoast. Petitioners had not previously sought out a tax strategy to minimize their tax from the asset sale and

[*8] had not considered selling their Holiday Bowl stock to MidCoast or any other entity. AmSouth's trust officer initially did not want to pursue the MidCoast proposal but believed he had a fiduciary duty to have Mr. Thomas investigate the proposal as it could provide a financial benefit to the estate. Mr. Hansell had learned about MidCoast in 2001, two years before the asset sale, from a MidCoast acquisition representative, Graham Paul Wellington, who had identified Mr. Hansell as being in a position to identify potential target corporations. MidCoast had offered Mr. Hansell a referral fee for finding target corporations that fit MidCoast's business model, i.e., a corporation that held cash and had realized taxable gain from an asset sale. Holiday Bowl was Mr. Hansell's first and only referral to MidCoast.

III.    MidCoast Representations to Petitioners and Their Advisers

In March 2003 Mr. Wellington contacted Holiday Bowl's accountant, Mr. Johnson, to express MidCoast's interest in purchasing Holiday Bowl stock. Mr. Wellington sent promotional materials to Mr. Johnson, who shared them with Mr. Thomas. The materials identified MidCoast as interested in purchasing the stock of corporations that had sold their assets and had taxable gain and proposed a stock sale to MidCoast as an alternative to the target's liquidation to maximize the target shareholders' after-tax proceeds. In the materials, MidCoast represented

[*9] that it had been in the financial services business since 1958 and in the asset recovery business since 1996 and was among the top 25 largest purchasers of delinquent consumer receivables in the United States. The materials described the typical aspects of a target corporation: a company wants to sell its business, a potential third-party purchaser wants to purchase the company's assets and not the stock, and the asset sale triggers gain. The materials also listed benefits of engaging in a transaction with MidCoast: the shareholders maximize after-tax profit, the target is not dissolved, liquidated, or consolidated, the target enters the asset recovery business and operates on a go-forward basis, and MidCoast causes the target to satisfy any tax liability due. MidCoast also provided sample computations that compared the tax advantages of a stock sale to MidCoast versus a corporate liquidation, labeling the tax saving an "asset recovery premium".

## A. MidCoast Communications With Accountants

After his initial discussion with Mr. Wellington, Mr. Johnson asked Rayleen Colletti, a certified public accountant with 20 years' experience, to assume primary responsibility at Johnson Hickey for assisting with the MidCoast proposal. In May 2003, before the sale of the bowling alleys closed, Ms. Colletti began communicating with Mr. Wellington regarding MidCoast's possible purchase of Holiday Bowl stock. Ms. Colletti questioned MidCoast's business

[*10] model and postclosing activities. MidCoast represented that it had an asset recovery business in which it bought delinquent credit card debt and other receivables and attempted to collect on those debts. Mr. Wellington represented that MidCoast acquired corporations with cash assets to develop its asset recovery business and the target is not dissolved after the stock purchase. He explained that by using cost recovery accounting, MidCoast could frontload expenses incurred in its asset recovery business (including skip tracing, collection expenses, and uncollectible debt writeoffs) during the first 18 to 24 months of operations to offset Holiday Bowl's taxable gain and thereafter the business would begin to generate income. MidCoast provided its acquisition representatives with a list of talking points for discussions with potential target corporations that corresponded with Mr. Wellington's representations, including that MidCoast acquired targets to develop its asset recovery business, each transaction was a stand-alone acquisition, the targets would continue in existence after the acquisition, and MidCoast had sufficient capital to satisfy the target's tax liability.

Ms. Colletti researched loss or shell corporation rules applicable to tax-avoidance transactions but did not conduct any research on listed transactions. Handwritten notes from Johnson Hickey identify "downsides" to the MidCoast transaction including "headaches and griefs", "pursuit by the IRS", "substance

[*11] over form", "no control on payment of tax", and "technically responsible-- 'have IRS' go after."  She did not request documentation from MidCoast of its postclosing business plan or business model, did not request documentation to substantiate MidCoast's claim that it could offset gain with losses from an asset recovery business, and did not independently verify MidCoast's representations of its business model.  She conducted internet research on MidCoast with the secretary of state and the Better Business Bureau.[5]  In late May 2003 Ms. Colletti provided MidCoast with Holiday Bowl's balance sheet and a pro forma tax return for its 2003 income tax.  She calculated petitioners' potential tax saving from the MidCoast transaction using three different premium percentages (10%, 12% and 15% premiums) and shared this information with Chambliss Bahner.

B.    MidCoast Communications With Attorneys

Petitioners sought legal advice on the MidCoast transaction from Mr. Thomas.  Mr. Thomas had limited experience with corporate transactions during his nearly 30-year legal career and sought assistance from other attorneys at Chambliss Bahner, including Kirk Snouffer, a tax attorney, and Mark Turner, a transactional attorney.  Mr. Snouffer passed away in March 2008 before these

---

[5]It is not clear which State's records Ms. Colletti researched.  MidCoast was incorporated in the State of Florida.

[*12] cases began. AmSouth did not participate in the negotiations with MidCoast. Throughout the entire process, AmSouth relied on petitioners' accountants and attorneys for advice on the tax consequences of the MidCoast transaction. On the basis of discussions with petitioners' advisers, AmSouth's trust officer understood that MidCoast would use expenses from its asset recovery business to defer Holiday Bowl's 2003 tax to future years and MidCoast would cause Holiday Bowl not to pay income tax for 2003.

IV.   MidCoast Letter of Intent

In June 2003 MidCoast presented a letter of intent to purchase Holiday Bowl stock for a price equal to Holiday Bowl's cash less 64.25% of its estimated 2003 tax liability. The final stock purchase agreement used this same price formula. In conjunction with the letter of intent, MidCoast provided a computation that petitioners would receive a $454,396 premium above Holiday Bowl's book value from the MidCoast transaction, resulting from tax saving on both the asset sale and the stock redemption. Ms. Colletti determined that petitioners would receive an after-tax benefit from the MidCoast transaction of $386,237, taking into account capital gains tax that petitioners would pay on the $454,396 premium. The letter of intent indicated that MidCoast would pay

[*13] Holiday Bowl's 2003 tax to the extent due on the basis of postclosing business activities.

V.    Communications Between MidCoast and Petitioners' Advisers

Over the next several months, petitioners' advisers had several conversations with MidCoast representatives regarding the MidCoast proposal. MidCoast representatives explained that MidCoast would use expenses from its asset recovery business to offset Holiday Bowl's gain from the asset sale.  At Mr. Snouffer's request, MidCoast provided five references.  The references were attorneys with prior experience on MidCoast transactions.  Petitioners' attorneys understood that MidCoast's tax strategy meant that Holiday Bowl would not pay income tax for 2003.  The attorneys expressed concern that the Internal Revenue Service (IRS) would challenge MidCoast's tax strategy and would assert transferee liability against petitioners.  Mr. Snouffer was aware of and considered the impact of Notice 2001-16, 2001-1 C.B. 730, Intermediary Transactions Tax Shelter, relating to listed transactions involving intermediary corporations.[6]  He

---

[6]In Notice 2001-16, 2001-1 C.B. 730, the IRS announced that it would challenge the reported tax results of certain intermediary transactions identified as "listed transactions" that the IRS considered to be tax shelters.  A listed transaction included the sale of corporate stock to one corporation (the intermediary) and the sale of assets to a different entity with a motive of avoiding tax on the long-term gain on the asset sale.

[*14] reviewed an article concerning IRS pronouncements on intermediary transactions, Thomas W. Avent & Patricia M. Rubirosa, "Not All Three-Party Transactions Are Created Equal", Corp. Bus. Tax'n Monthly 17 (May 2003), and had a discussion with Mr. Avent. The article reviewed the risks of engaging in specific intermediary transactions and the risks of transferee liability and indicated that the IRS intended to use substance over form, economic substance, and other theories against such listed transactions. The article described a situation similar to Holiday Bowl's where the sale of a target's assets occurred first and was followed by a sale of the target's stock and stated:

> In that case, MidCo would have the benefit of the monies paid by Buyer for some of Target's assets, once it acquires Target's stock. While the ultimate benefits of such transaction may resemble those of the MidCo transactions described above, this type of transaction clearly fails to satisfy the criteria for the transactions the IRS has set its sights on in the pronouncements.

This portion of the article was marked by someone who read the article. Mr. Avent had worked at KPMG and was one of the references provided by MidCoast. Mr. Snouffer knew that KPMG had been an adviser to MidCoast in similar transactions. The record relating to Mr. Snouffer's legal research, analysis, and conclusions with respect to the MidCoast transaction is minimal and consists primarily of handwritten notes and billing records. The billing records indicate he

[*15] researched listed transactions and reviewed IRS announcements, chief counsel advice documents, and the above-quoted article. He contacted three references; one reference confirmed that MidCoast closed the transactions that it started. There is no other evidence in the record with respect to Mr. Snouffer's communications with these references. Nor is there evidence that petitioners' advisers contacted any references with respect to MidCoast's business practices or contacted any one in the asset recovery business about MidCoast.

## VI. Advice From Accountants and Attorneys

In August 2003 petitioners met with their advisers to discuss the MidCoast transaction. The trust officer's notes from this meeting indicate that MidCoast would "keep shell of corp open for 7 years" and that MidCoast "has been doing this transaction for 6-7 years". Mrs. Hawk requested that the advisers provide their advice in writing. Both Chambliss Bahner and Johnson Hickey did so in August 2003 in letters to Mrs. Hawk and the trust officer.

### A. Attorney Advice Letter

Mr. Thomas signed the attorney letter. It stated that the attorneys had reviewed MidCoast, its history, and its business plan and practices and had reviewed Federal tax law. In the letter Mr. Thomas advised that MidCoast had a profit motive for purchasing Holiday Bowl stock and planned to operate Holiday

[*16] Bowl for several years. The letter referred to MidCoast's tax strategy as a deferral of tax. The attorneys wrote of MidCoast's business purpose:

> In essence, they plan to leverage their profits by purchasing Holiday Bowl's cash at a discount based on its tax liability and then deferring the actual payment of tax since they have heavy expenses in the early months after a loan portfolio purchase. They have more cash available to purchase loans this way, so they end up making a greater profit in the end.

The letter stated that MidCoast had engaged in similar transactions for several years "apparently without difficulty" with the IRS. It also mentioned MidCoast's indemnity for Holiday Bowl's 2003 Federal income tax. The attorneys advised that the MidCoast transaction would be a reasonable exercise of the executors' discretion if MidCoast provided financial information to establish its ability to pay the 2003 tax in the event the IRS challenged MidCoast's tax strategy. The letter did not address or analyze Notice 2001-16, supra.

### B. Accountant Advice Letter

Ms. Colletti initially drafted the accountant letter; it was signed by Mr. Johnson. The accountant letter described the stock redemption and MidCoast transaction and provided specific advice concerning the redemption and the distribution of Snow Hill Road. In the letter the accountants advised distributing Snow Hill Road as a partial redemption followed by a stock sale to MidCoast,

[*17] characterizing the two events as a complete liquidation of petitioners'

interests in Holiday Bowl because of concerns with State tax.  With respect to the

MidCoast transaction, the accountants indicated concern that the IRS could

challenge the MidCoast transaction as a tax-avoidance strategy, stating:

> Since MidCoast will be paying a premium based on the net asset value, the potential area of concern is the assertion by the IRS that the subsequent expenses are disallowable under the "shell" or "loss" corporation rules.  The "shell" corporation rule provides for the disallowance of deductions and other tax benefits when tax avoidance is the principal purpose of acquisition of control of a corporation.  If the IRS is successful in this assertion, the corporation would not be eligible to reduce its pre-acquisition tax liability with subsequent losses generated after acquisition by MidCoast.  However, it is our understanding * * * the prior shareholders (the Hawks) are indemnified against any subsequent assessments made by the IRS or other taxing authorities.

The letter indicated that the indemnity "secured a minimal level of risk" to

petitioners.  In the letter, the accountants stated that MidCoast had a "clear

business purpose and profit motive" for acquiring Holiday Bowl, briefly described

MidCoast's plan to generate net operating losses, and concluded that the tax

strategy "can be supported upon scrutiny by the IRS".

C.    Parent Guaranty

After the two letters, petitioners' attorneys attempted, without success, to

obtain financial information from MidCoast to ensure that it had sufficient capital

**[*18]** to pay Holiday Bowl's tax if its tax strategy failed.  Instead, they negotiated a guaranty from the MidCoast entities' parent corporation (parent guaranty) for Holiday Bowl's 2003 tax.  They downplayed MidCoast's refusal to provide financial information as a typical policy of privately held companies such as MidCoast.  They believed that the parent guaranty provided adequate protection to petitioners against transferee liability for Holiday Bowl's 2003 tax if MidCoast's tax strategy did not work.  Petitioners did not obtain any financial information from the parent, however.

D.    Second Attorney Advice Letter

Chambliss Bahner issued a second letter, dated September 8, 2003, addressing MidCoast's refusal to provide financial information.  The second attorney letter stated:

> [T]he transaction is not one which under current law would allow the Internal Revenue Service to assess income tax against the selling shareholders.
>
> If despite this conclusion, the Internal Revenue Service should find a way to impose such a tax on the selling shareholders, the indemnity of MidCoast Credit Corp. is the second line of defense for the shareholders.

Mr. Thomas discussed his legal advice in a telephone call with Mrs. Hawk and AmSouth's trust officer following the second letter.  He reiterated that while the

**[\*19]** possibility that petitioners would be held liable as transferees was remote, there was no guaranty that they would not be. The second letter did not address Notice 2001-16, <u>supra</u>. Mrs. Hawk indicated that she understood there were no guaranties and believed that the attorneys had done their "homework". On the basis of this advice, Mrs. Hawk decided to proceed with the MidCoast transaction. However, from her testimony it is clear that she did not understand MidCoast's business plan or stated tax strategy.

VII.   <u>Share Purchase Agreement</u>

Throughout the months of September through November 2003, Holiday Bowl's attorneys communicated with MidCoast's counsel regarding due diligence of Holiday Bowl and closing procedures. On November 12, 2003, petitioners entered into a share purchase agreement with MidCoast for the Holiday Bowl stock for $3,423,679. The purchase price was calculated using the amount of Holiday Bowl's cash and prepaid tax deposits reduced by 64.25% of its estimated 2003 Federal, State, and local tax liability.[7] MidCoast also agreed to reimburse petitioners for legal and accounting fees up to $25,000. At closing petitioners

---

[7]The share purchase agreement calculated the $3,423,679 purchase price as follows: cash of $4,185,389 plus prepaid deposits of $29,980 less tax liability of $791,690.

[*20] received $3.45 million.[8]  Ms. Colletti calculated the estimated taxes used in the share purchase agreement at $1,232,203, referred to as the "Deferred Tax Liability".[9]  The tax liability resulted from both the gain on the asset sale and the gain on the stock redemption.

MidCoast acquired the Holiday Bowl stock as follows:  75% to MidCoast Credit Corp. and 25% to MidCoast Acquisition Corp.  The share purchase agreement provided that MidCoast would prepare and file Holiday Bowl's 2003 tax return and would pay Holiday Bowl's 2003 tax to the extent any portion was "due to post-closing business activities".  It did not contain any representations or covenants with respect to representations made by MidCoast or contained in its promotional materials such as using bad debt deductions from an asset recovery business to offset Holiday Bowl's tax, reengineering Holiday Bowl into an asset recovery business, or continuing Holiday Bowl as a going concern.

---

[8]After the closing, petitioners returned $1,321 to the escrow agent because of an overpayment, and petitioners received a net $3,448,679 in purchase price and fee reimbursement.

[9]The "Deferred Tax Liability" included $1,017,596 in Federal taxes and $214,607 in Tennessee franchise and excise taxes.

[*21] VIII.   Sequoia Loans

On November 12, 2003, the same day as the MidCoast transaction, MidCoast entered into two demand credit agreements with Sequoia Capital, LLC (Sequoia), an offshore entity, to borrow $3.45 million and agreed to repay $3,467,250 on demand.[10]  The parties noted the $17,250 difference between the amounts advanced and the amounts repayable as a .5% loan fee.  The loans accrued interest charges only upon default.  The parties did not execute demand notes or subsidiary guaranties attached as schedules to the loan agreements.  They executed security agreements granting Sequoia a security interest in Holiday Bowl's cash.  The record contains an executed copy of one security agreement. The loans were repayable upon demand by the lender.  Ultimately, MidCoast borrowed and repaid the loans on the same day through a credit on the resale of Holiday Bowl to Sequoia.  Mr. Thomas understood that MidCoast would finance the purchase of the Holiday Bowl stock with a loan from an offshore entity.

---

[10]MidCoast Acquisition Corp. and MidCoast Credit Corp. each entered into separate demand credit agreements with Sequoia.  MidCoast Acquisition borrowed $862,500 and agreed to repay $866,813; MidCoast Credit borrowed $2,587,500 and agreed to repay $2,600,438.

**[\*22]** IX.    Escrow Agreements

The share purchase agreement required Holiday Bowl to deposit its cash into escrow immediately before closing.  A prior draft of the share purchase agreement provided for Holiday Bowl to deposit its cash with its own law firm and at closing MidCoast would deliver the purchase price to petitioners simultaneously with Holiday Bowl's deliverance of its cash to MidCoast via a cashier's check or certified check from Chambliss Bahner.  The parties revised the share purchase agreement to require Holiday Bowl to escrow its cash with an escrow agent chosen by MidCoast.  Morris Manning & Martin, LLP (Morris Manning), acted as the escrow agent.  MidCoast was not a party to the escrow agreement.  The escrow agreement required Holiday Bowl to deposit its cash in escrow upon execution of the escrow agreement, which in effect was immediately before closing of the MidCoast transaction.  The stated purpose of the escrow was for Holiday Bowl's cash to become postclosing security for the Sequoia loans.  Petitioners' transactional attorney Mr. Turner inserted a provision in the escrow agreement that it was the parties' intention that the escrow agent not release Holiday Bowl's escrow funds to MidCoast or Sequoia until petitioners received the purchase price.

The share purchase and escrow agreements did not require Sequoia or MidCoast to deposit the purchase price into escrow; rather it required MidCoast or

[*23] its lender to wire the purchase price to petitioners. When negotiating the escrow and share purchase agreements, Mr. Turner raised concerns about whether MidCoast was putting money into the deal. On October 26, 2003, Mr. Turner commented in an email to Mr. Thomas and Mr. Snouffer: "[O]ur firm is required to open up a trust account into which the closing proceeds will be deposited. I take it that at closing we will disburse the purchase price to our clients out of that account and that the remainder will be disbursed to the purchaser."

X.      Distribution of Holiday Bowl Funds and Purchase Price

Pursuant to the escrow agreement, Holiday Bowl deposited its cash of approximately $4.2 million into the escrow agent's trust account (trust account). Approximately five minutes later, the escrow agent transferred $3.45 million as the purchase price and fee reimbursement from the trust account to petitioners through Chambliss Bahner. Absent the Holiday Bowl funds, the trust account did not have sufficient cash to pay the purchase price. At the time of the MidCoast transaction, the escrow agent also held funds for Sequoia in a client escrow account (client account) separate from the trust account in excess of the amount of the purchase price. On the day after the MidCoast transaction, the escrow agent transferred $31 million of the funds held for Sequoia from the client account to the trust account. Chambliss Bahner subsequently wired a portion of the purchase

[*24] price to the estate and Mrs. Hawk. Chambliss Bahner reserved $100,000 of the purchase price; $41,062 was credited against petitioners' legal fees and expenses including fees not covered by the fee reimbursement. The legal fees were allocated $7,699 to Mrs. Hawk and $33,363 to the estate. Chambliss Bahner distributed the remainder of the reserved funds to the estate and Mrs. Hawk. In total Mrs. Hawk received $608,640 from the MidCoast transaction, and the estate received $2,840,661.

At closing the escrow agent also transferred $80,057 and $240,170 to the MidCoast entities from the trust account. Two days later, the escrow agent transferred $192,452 to a newly opened bank account in the name "MidCoast Credit Corp. FBO Holiday Bowl Inc." Five days after closing, the escrow agent transferred $3,990,000 from the trust account to an offshore account in the name of Delta Trading Partners, LLC (Delta Trading account), pursuant to the instructions of Holiday Bowl's newly appointed president.

XI.    Escrow Agent's Account Ledgers

On November 3, 2003, before closing, the trust account received a deposit of approximately $35 million that the escrow agent transferred into the client account that same day. The escrow agent recorded the deposit as attributable to Sequoia Capital/General in its account ledger. The Sequoia Capital/General

[*25] account ledger also recorded the payment of the $3.45 million purchase price and the two transfers to the MidCoast entities that occurred on the closing date. The escrow agent maintained a separate account ledger in the name of Sequoia Capital & Affiliates that recorded receipt of Holiday Bowl's escrowed cash, the $192,452 transfer to the newly opened bank account, and the $3,990,000 transfer to the Delta Trading account. The escrow agent's ledgers contain dates that are inconsistent with bank records, including inconsistencies with respect to entities not related to these cases.

XII.   Sequoia Purchase of Holiday Bowl

On the same day it purchased the Holiday Bowl stock, MidCoast resold the stock to Sequoia for a slightly higher purchase price. Sequoia paid for the Holiday Bowl stock through a credit against the Sequoia loans. Petitioners and their advisers were not aware of MidCoast's plan to immediately resell the Holiday Bowl stock to Sequoia. Neither Sequoia or MidCoast placed Holiday Bowl into an asset recovery business.

XIII.   Redemption of Snow Hill Road

At the time of Mr. Hawk's death, Holiday Bowl owned unimproved real property, Snow Hill Road, valued at $770,000. The Hawk family wanted to retain Snow Hill Road and had not offered it for sale with the bowling alleys. Ms.

[*26] Colletti recommended that Holiday Bowl distribute Snow Hill Road through a partial stock redemption to occur on the same day as the MidCoast transaction. The share purchase agreement acknowledged the redemption. Ms. Colletti had asked Mr. Wellington for advice regarding the distribution of Snow Hill Road, and he referred her to two revenue rulings and a court case. Ms. Colletti advised that petitioners treat the redemption as part of an overall plan of a complete corporate liquidation to avoid unfavorable State tax consequences. She advised that there was no Federal tax impact from distributing Snow Hill Road as a redemption versus a dividend. She further advised that petitioners distribute Snow Hill Road in a liquidating distribution, not a stock redemption, if the parties did not engage in the MidCoast transaction.

On November 12, 2003, Holiday Bowl redeemed a total of 2,770 shares in exchange for Snow Hill Road, including 692 class A voting shares and 1,559 class B nonvoting shares from the estate and 519 class B nonvoting shares from Mrs. Hawk, and a nominal amount of cash in lieu of fractional shares. On the basis of their respective ownership interests, Mrs. Hawk and the estate received real property valued at $144,375 and $625,625, respectively, in the stock redemption, plus the nominal cash. The redemption did not affect the ownership percentages of Holiday Bowl. Holiday Bowl realized gain on the distribution of

[*27] Snow Hill Road of approximately $368,000 and incurred $141,000 in Federal income tax. MidCoast assumed this tax liability in the share purchase agreement. After the stock redemption, Holiday Bowl's assets consisted solely of cash and prepaid tax deposits. Holiday Bowl reported the stock redemption on its 2003 return as a sale of appreciated property with a sale price of $770,000.

XIV. Successive Transfers to Marital Trusts

In total Mrs. Hawk received $753,015 in the MidCoast transaction and redemption. The estate received $3,466,286. On November 18, 2003, the estate transferred $1,912,665 to the nonexempt trust and $511, 976 to the exempt trust from the proceeds.

XV. Holiday Bowl Tax Returns

Holiday Bowl filed its corporate income tax return for 2003, reporting no tax liability. Holiday Bowl reported ordinary and capital gain from the asset sale and stock redemption and deducted losses generated through transactions described as interest rate swap options and DKK/USD binary options sufficient to offset the reported gain. Petitioners and their advisers were not involved in preparing or reviewing Holiday Bowl's 2003 return. Holiday Bowl filed returns for 2004 and 2005 and marked the 2005 return as its final return. In 2004 Holiday Bowl organized as a Nevada corporation and dissolved its Tennessee corporate

[*28] status. The State of Nevada revoked Holiday Bowl's corporate status in July 2006. Respondent filed notices of tax lien against Holiday Bowl in Tennessee and Nevada.

XVI. Examination of Holiday Bowl Returns

In 2005 the IRS began an examination of MidCoast relating to transactions it promoted from 2000 through 2004 and identified MidCoast's acquisition of Holiday Bowl as part of that examination. Respondent issued a notice of deficiency to Holiday Bowl for 2003, 2004, and 2005, dated July 11, 2007.[11] Respondent determined an income tax deficiency for Holiday Bowl's 2003 tax year of $965,358 and an accuracy-related penalty under section 6662 of $378,107. Holiday Bowl did not file a petition to challenge the notice. The 2003 deficiency determination resulted primarily from the disallowance of loss deductions relating to the disposition of the interest rate swap options and offsetting DKK/USD binary options executed after the MidCoast transaction. In December 2007 respondent assessed tax and a penalty against Holiday Bowl for 2003 as determined in the notice of deficiency, plus interest. Holiday Bowl has not paid any portion of the

---

[11]Respondent has not asserted transferee liability against petitioners for 2004 and 2005. The deficiencies in those years were $599 and $2, respectively.

**[*29]** assessment. Respondent investigated Holiday Bowl's financial status and determined that it did not have assets to pay the deficiency.

The IRS assigned the Holiday Bowl case to a revenue officer in October 2006 to determine collection potential against Holiday Bowl and Mrs. Hawk. The revenue officer issued a report on the collection potential for Mrs. Hawk in December 2006, referring to Mrs. Hawk's transferee liability in error, and for Holiday Bowl in February 2007. Both reports were completed before respondent issued the 2003 notice of deficiency to Holiday Bowl and before he assessed tax against Holiday Bowl for 2003. The revenue officer did not investigate collection potential with respect to Sequoia or MidCoast.

In September 2009 respondent issued the four statutory notices of liability at issue here, determining that petitioners are liable as initial and/or successive transferees for Holiday Bowl's 2003 unpaid tax and section 6662 penalty. The notices assert that the estate and the exempt trust are liable for the full amount of Holiday Bowl's 2003 tax, penalty, and interest and assert that the nonexempt trust and Mrs. Hawk are liable for $511,976 and $734,396, respectively, of the deficiency and penalty, plus interest.

**[\*30]**                                    OPINION

Section 6901(a)(1) addresses transferee liability and provides that the Commissioner may proceed against a transferee of property to assess and collect Federal income tax, penalties, and interest owed by the transferor.  Section 6901(a) does not create or define a substantive liability but merely provides a procedural mechanism for the Commissioner to collect the transferor's existing unpaid tax liability.  Coca-Cola Bottling Co. v. Commissioner, 334 F.2d 875, 877 (9th Cir. 1964), aff'g 37 T.C. 1006 (1962); Mysse v. Commissioner, 57 T.C. 680, 700-701 (1972); Kreps v. Commissioner, 42 T.C. 660, 670 (1964), aff'd, 351 F.2d 1 (2d Cir. 1965).  The Commissioner may collect unpaid taxes of a transferor from either an initial transferee or a successive transferee.  Sec. 6901(a), (c)(2); Commissioner v. Stern, 357 U.S. 39, 42 (1958); Stansbury v. Commissioner, 104 T.C. 486, 489 (1995), aff'd, 102 F.3d 1088 (10th Cir. 1996).

Under section 6901(a) the Commissioner may establish transferee liability if an independent basis exists under applicable State law or equity principles for holding the transferee liable for the transferor's debts.  Sec. 6901(a); Commissioner v. Stern, 357 U.S. at 42-47.  State law determines the elements of transferee liability, and section 6901 provides the remedy or procedure that the Commissioner employs as the means of enforcing that liability.  Ginsberg v.

[*31] Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961).

Respondent bears the burden of proving that petitioners are liable as transferees

but not of proving that the transferor is liable for tax. See secs. 6902(a), 7454(c);

Rule 142(d). To impose transferee liability, the Court must determine whether

three conditions exist: (1) the taxpayer (transferor) is liable for the unpaid tax,

(2) petitioners are liable as transferees within the meaning of section 6901, and

(3) petitioners are subject to substantive liability as transferees under applicable

State law or State equity principles. See Diebold Found., Inc. v. Commissioner,

736 F.3d 172, 183-184 (2d Cir. 2013), vacating and remanding T.C. Memo. 2010-

238; Starnes v. Commissioner, 680 F.3d 417, 427 (4th Cir. 2012), aff'g T.C.

Memo. 2011-63; Swords Tr. v. Commissioner, 142 T.C. 317, 336 (2014). The

determinations of petitioners' substantive liability under State law and transferee

status under Federal law are separate and independent determinations. See

Feldman v. Commissioner, 779 F.3d 448, 458 (7th Cir. 2015), aff'g T.C. Memo.

2011-297; Salus Mundi Found. v. Commissioner, 776 F.3d 1010, 1012 (9th Cir.

2014), rev'g and remanding T.C. Memo. 2012-61; Sawyer Tr. of May 1992 v.

Commissioner, 712 F.3d 597, 605 (1st Cir. 2013), rev'g and remanding T.C.

Memo. 2011-298; Starnes v. Commissioner, 680 F.3d at 429. We will consider

[*32] whether petitioners are liable as transferees under State law before determining the application of section 6901.

I.     State Law Liability Requirement

The applicable State law is the law of the State where the transfer occurred, in these cases Tennessee.  See Commissioner v. Stern, 357 U.S. at 45; Rubenstein v. Commissioner, 134 T.C. 266, 270 (2010).  Tennessee has adopted the Uniform Fraudulent Transfer Act (TUFTA), which protects creditors when a debtor makes a fraudulent transfer.  Tenn. Code Ann. sec. 66-3-301 through sec. 66-3-313 (West 2004).  Under TUFTA a creditor can recover judgment against a transferee for the value of the property transferred or, if less, the amount of the creditor's claim.  Id. sec. 66-3-309(b).

A.     Constructive Fraud Under State Law

TUFTA imposes transferee liability on the basis of both actual and constructive fraud.  See id. sec. 66-3-305(a)(1) (actual fraud), secs. 66-3-305(a)(2), 66-3-306(a) (constructive fraud).  TUFTA provides three definitions for constructive fraud that apply regardless of the transferor's or transferee's actual intent.  Respondent argues that petitioners are liable as transferees on the basis of

**[*33]** actual fraud and each of the three definitions of constructive fraud.[12] Respondent's primary argument is the constructive fraud provision applicable to present creditors. Accordingly, we will address that provision first. A transfer is fraudulent as to a present creditor if the debtor did not receive a reasonably equivalent value for the transfer and the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. Id. sec. 66-3-306(a). Tennessee courts use a three-part test to determine whether a constructively fraudulent transfer has occurred: (1) the claim arose before the transfer, (2) the debtor did not receive a reasonably equivalent value, and (3) the debtor was insolvent or rendered insolvent by the transfer. See Stoner v. Amburn, 2012 WL 4473306, at *10 (Tenn. Ct. App. Sept. 28, 2012); Stone v. Smile, 2009 WL 4893563, at *4 (Tenn. Ct. App. Dec. 18, 2009). This provision applies regardless of the transferee's or transferor's actual intent. A debtor is insolvent if the sum of its debts exceeds all of its assets at a fair valuation. Tenn. Code Ann. sec. 66-3-303(a).

The threshold requirement for liability under TUFTA is that a transfer has occurred. Accordingly, we first must determine whether petitioners received a

---

[12]Respondent also argues that petitioners are liable under the Tennessee trust fund doctrine.

[*34] transfer from Holiday Bowl under State law. Next, if we find that petitioners received a transfer, we must determine whether that transfer was fraudulent as defined in the constructive or actual fraud provisions of TUFTA. Respondent contends that petitioners received two transfers from Holiday Bowl: (1) the stock in the redemption for Snow Hill Road and (2) a cash transfer from Holiday Bowl of the $3.45 million purchase price in the MidCoast transaction as a disguised liquidating distribution. Petitioners do not dispute that they received Snow Hill Road from Holiday Bowl but argue that the redemption was not fraudulent under TUFTA. They do dispute that they received a transfer from Holiday Bowl in the MidCoast transaction. They argue that they received the purchase price from MidCoast through the Sequoia loans, not from Holiday Bowl. According to petitioners, a transfer from MidCoast does not subject them to State fraudulent transfer liability.[13] Respondent argues that we should recharacterize the MidCoast transaction as a transfer from Holiday Bowl to petitioners.

---

[13]The Court directed the parties to address on brief whether petitioners are liable as successive transferees of MidCoast or Sequoia under the reasoning of Sawyer Tr. of May 1992 v. Commissioner, 712 F.3d 597 (1st Cir. 2013), rev'g and remanding T.C. Memo. 2011-298. Respondent failed to address this issue on brief, and we conclude that he has conceded this basis for petitioners' transferee liability.

**[*35]** B.      Recharacterization of a Transaction Under State Law

Respondent contends that Tennessee law would recharacterize the MidCoast transaction as a transfer from Holiday Bowl under two theories:  (1) the Sequoia loans were shams, and petitioners received Holiday Bowl cash as payment of the purchase price or (2) the MidCoast transaction was in substance a disguised corporate liquidation and petitioners received a $3.45 million liquidating distribution from Holiday Bowl.  A transferee's substantive liability is determined solely by reference to State law, and any decision to recast the MidCoast transaction is made under State law.  Salus Mundi Found. v. Commissioner, 776 F.3d at 1020; cf. Shockley v. Commissioner, T.C. Memo. 2015-113 (noting that Wisconsin courts used the substance over form doctrine in the same manner as Federal courts).  State law governing creditor rights generally applies to determine the substance of the transaction.  Sawyer Tr. of May 1992 v. Commissioner, 712 F.3d at 605 n.2; Starnes v. Commissioner, 680 F.3d at 420; Ewart v. Commissioner, 814 F.2d 321, 324 (6th Cir. 1987).  But see Shockley v. Commissioner, T.C. Memo. 2015-113.  Respondent must establish constructive fraud under TUFTA using the legal theories available to any creditor.

Tennessee courts have long recognized equitable principles that disregard the form of a transaction and look to its substance.  "Equity looks not to the

[*36] outward form, but to the inward substance, of every transaction." Bond v. Jackson, 4 Tenn. 189, 191 (1817); see Still v. Fuller (In re Sw. Equip. Rental, Inc.), 1992 WL 684872, at *14 (E.D. Tenn. July 9, 1992) (predecessor of Tennessee UFCA at issue); Halco Fin. Serv., Inc. v. Foster, 770 S.W.2d 554, 555 (Tenn. Ct. App. 1989);. Respondent cites Tennessee caselaw predating TUFTA that applies substance over form principles or treats a transaction as a sham.[14] See Dillard & Coffin Co. v. Smith, 105 Tenn. 372 (1900) (holding that the sale of property to a family member was fraudulent because it was entered into with intent to defraud creditors); St. John v. Hodges, 68 Tenn. 334 (1878) (setting aside the compromise of debt because of a lack of authority to enter into the compromise); Harris v. Smith, 42 Tenn. 306 (1865) (refusing to enforce a fraudulent contract); Bond v. Jackson, 4 Tenn. 189 (1817) (granting equitable relief from a contract entered into by mutual mistake); Halco Fin. Serv., Inc. v. Foster, 770 S.W.2d 554 (Tenn. Ct. App. 1989) (disregarding the form of a transaction because the parties used a lease as the form to avoid usury laws where the substance of the transaction was a loan); Warren v. Hinson, 52 S.W. 498 (Tenn. Ct. App. 1899) (upholding an

---

[14]TUFTA effectively replaced similar provisions contained in Tennessee's Uniform Fraudulent Conveyance Act (TUFCA). See Paris v. Walker (In re Walker), 2017 WL 1239561 (Bankr. E.D. Tenn. Apr. 3, 2017). Tennessee first enacted a verison of a uniform fraudulent conveyance law in 1919. 1919 Tenn. Pub. Acts ch. 125 sec. 2.

**[*37]** assignment of an insurance policy as not fraudulent). These cases demonstrate the principles codified in the uniform fraudulent transfer laws but do not set forth a specific analysis used to determine whether to disregard the form of a transaction. Respondent also cites Tennessee tax cases that considered equitable principles to recharacterize the transactions at issue. In CAO Holdings, Inc. v. Trost, 333 S.W.3d 73 (Tenn. 2010), the Tennessee Supreme Court denied both parties' summary judgment motions and reserved for trial the issue of whether a lease was illusory and entered into for the purpose of avoiding State sales and use tax. In Odd Fellows Benevolent & Charitable Ass'n v. City of Nashville, 173 Tenn. 55 (1938), the Tennessee Supreme Court disregarded the form of the transaction because it was used, without substance, to achieve tax-exempt status. In Rosewood, Inc. v. Garner, 476 S.W.2d 273 (Tenn. Ct. App. 1971), a Tennessee appellate court rejected the form of a corporation as a tax-exempt entity because the corporation operated for the member's financial benefit.

Petitioners argue that we should not rely on equitable principles such as the economic substance doctrine because TUFTA does not expressly incorporate the economic substance doctrine and no Tennessee court has applied the doctrine in determining transferee liability under TUFTA. Respondent notes that the Court of Appeals for the Sixth Circuit treats a transaction as having economic substance for

[*38] Federal tax purposes only if the transaction has practical economic effects other than tax consequences and the taxpayer had a profit motive. Dow Chem. Co. v. United States, 435 F.3d 594, 599 (6th Cir. 2006). The economic substance doctrine as defined by the Court of Appeals for the Sixth Circuit involves a subjective analysis of the taxpayer's intent in the second prong. See Winn-Dixie Stores, Inc. & Subs. v. Commissioner, 113 T.C. 254, 280 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001). However, if the Court determines that a transaction is a sham, i.e., lacking economic substance, the transaction is disregarded for Federal tax purposes and the subjective inquiry into the taxpayer's motive is not made. Dow Chem. Co. v. United States, 435 F.3d at 599; see Owens v. Commissioner, 568 F.2d 1233, 1237 (6th Cir. 1977), aff'g in part, rev'g in part 64 T.C. 1 (1975). Similarly, the substance over form doctrine is concerned with the parties' intentions and the economic realities contemplated by the parties. Groetzinger v. Commissioner, 87 T.C. 533, 542 (1986).

In Niuklee v. Commissioner, 2015 WL 6941593 (Tenn. Ct. App. Nov. 9, 2015), cited by petitioners, a Tennessee court of appeals considered the statutory interpretation of a State tax law for an exemption to State sales tax. The court declined to apply the economic substance doctrine to the transaction at issue, stating: "No Tennessee court has applied the economic substance doctrine."

**[*39]** Id. at *7. The case involved the construction of the statutory term "bona fide" sale. The court found that under the statute a lease made for a legitimate business purpose other than tax avoidance and for valuable consideration constitutes a "bona fide" sale. Id. As the statute was clear, the court did not consider the economic substance doctrine. Id. Petitioners argue that we should not rely on the economic substance doctrine here on the basis of the reasoning in Niuklee. They argue that TUFTA does not expressly incorporate the economic substance doctrine, no Tennessee court has applied the doctrine to TUFTA, and the Niuklee decision indicates the State's highest court would not apply the economic substance doctrine to these cases.[15] They contend that the form of the MidCoast transaction should be respected--they sold their stock to MidCoast, received payment from MidCoast, received nothing from Holiday Bowl in the stock sale, and are not transferees of Holiday Bowl with respect to the stock sale. Cf. Nashville Clubhouse Inn v. Johnson, 27 S.W.3d 542 (Tenn. Ct. App. 2000) (relying on substance over form principles in sales tax case).

---

[15]A Federal court must follow the decisions of the State's highest court when that court has addressed the relevant issue. Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir. 1999). Where no State court has decided the point at issue, a Federal court must predict or anticipate how that State's highest court would rule. Bear Stearns Gov't Sec. v. Dow Corning Corp. (In re Dow Corning Corp.), 419 F.3d 543, 549 (6th Cir. 2005); Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc., 249 F.3d 450, 454 (6th Cir. 2001).

[*40] We have not found any State court case that applies judicial doctrines of economic substance, substance over form, or sham transaction with respect to transfers governed by TUFTA. The Court of Appeals for the Sixth Circuit has not considered a case involving a MidCoast transaction or a similar intermediary transaction. However, we find that it is appropriate to consider equitable principles to determine whether to recast the MidCoast transaction. TUFTA expressly incorporates equitable principles. Tenn. Code Ann. sec. 66-3-311. Furthermore, TUFTA broadly defines the term "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset". Id. sec. 66-3-302(12).

### 1. Whether the Sequoia Loans Were Shams

Respondent argues that the Sequoia loans were shams and that MidCoast paid the purchase price using Holiday Bowl's cash. He argues that Holiday Bowl transferred its cash to the escrow agent, petitioners received the purchase price from Holiday Bowl's escrowed funds, and then the escrow agent distributed the remaining Holiday Bowl funds to MidCoast as a premium. The escrow agent's trust account did not have sufficient funds to pay the purchase price without Holiday Bowl's money.

**[*41]** We find that the Sequoia loans were shams.[16] We make this decision irrespective of whether the escrow agent held Sequoia funds in a separate client account as petitioners suggest. Assuming Sequoia provided funds to MidCoast, it did so not as a bona fide lender but to create the appearance of a loan and to disguise the true nature of the transaction as a liquidating distribution. A loan is an extension of credit; the Sequoia loans were not true extensions of credit. First, Sequoia and MidCoast failed to execute loan documents such as demand notes. Second, the loans were extended and repaid on the same day through a credit on the resale of Holiday Bowl to Sequoia. The parties contemplated immediate repayment as the loans were payable on demand and did not bear interest except upon default. Third, the loans included a $17,250 loan fee. As the Sequoia loans remained outstanding for one day, the $17,250 fee would represent an annual interest of over $6.2 million, nearly twice the amount of the Sequoia loans. We find that the loan fee compensated Sequoia for its participation in the tax scheme to disguise a liquidating distribution to petitioners.

Another indication that the Sequoia loans were shams and not true extensions of credit is that the parties intended to use Holiday Bowl's cash to fully

---

[16]For simplicity we use the term "loan" irrespective of our decision that the Sequoia loans were shams.

[*42] secure the loans. The escrow agreement required Holiday Bowl to deposit its cash into escrow before the stock sale and identified the purpose of the escrow as security for the Sequoia loans. The escrow agreement gave Sequoia control over Holiday Bowl's cash at closing. Sequoia did not bear any risk. MidCoast was not required to escrow the purchase price. By the terms of the escrow agreement, only Holiday Bowl was required to infuse capital into the deal. The fact that petitioners were unaware of MidCoast's plan to allegedly resell Holiday Bowl though a credit against the loans is not significant because petitioners knew the Holiday Bowl cash secured the Sequoia loans. MidCoast's representation that it needed a loan to purchase a corporation holding only cash and then would use the cash to purchase delinquent debt should have caused petitioners' advisers serious concern. For these reasons we find that the Sequoia loans were shams. Sequoia was not a bona fide lender. It joined the MidCoast transaction to create the form of a loan and to disguise the liquidating distribution.

Petitioners contend that the Sequoia loans were funded and point to the escrow agent's account ledgers. They argue that even though the purchase price was paid from the trust account, the escrow agent held the Sequoia loans in a separate client account. The trust account lacked sufficient funds to pay the purchase price unless the escrow agent used Holiday Bowl's cash. The parties

[*43] stipulated that Sequoia deposited nearly $35 million with the escrow agent on November 2, 2003, and the escrow agent retained those funds on the date of the MidCoast transaction, albeit in a different account. The record does not establish the purpose for the $35 million deposit. Petitioners speculate that the escrow agent held a portion of those funds to pay the Holiday Bowl purchase price. The escrow agent recorded the payment of the purchase price on its account ledgers as paid from the $35 million deposit. However, we have found that the account ledgers are inconsistent and not reliable.

Petitioners also contend that the terms of the share purchase agreement and the escrow agreement support a finding that Holiday Bowl cash was not used to pay the purchase price. As originally drafted, the share purchase agreement provided for the simultaneous exchange of money: delivery of Holiday Bowl's cash to MidCoast and MidCoast's payment of the purchase price. In the final version, however, neither the share purchase nor the escrow agreement required MidCoast or Sequoia to deposit funds with the escrow agent. Revisions to the share purchase agreement allowed MidCoast to purportedly acquire Holiday Bowl with the mere appearance of a loan and without an inflow of cash. The contract terms did not prevent petitioners from receiving Holiday Bowl's cash back as payment of the purchase price. The share purchase agreement stated that it was

[*44] the parties' intention that petitioners would receive the purchase price before Holiday Bowl's escrowed funds were paid over to MidCoast. Similarly, the escrow agreement stated that the escrow agent would not release Holiday Bowl's funds to Sequoia or MidCoast until petitioners received the purchase price. Neither of these provisions prevented MidCoast from using Holiday Bowl's cash to pay the purchase price. Rather, the agreements required only that the escrow agent pay petitioners before it paid any excess Holiday Bowl cash over to MidCoast. Conversely, in Alterman Tr. v. Commissioner, T.C. Memo. 2015-231, decided in favor of the transferee, both parties to the stock sale were contractually obligated to deposit funds into escrow. Id. at *23. The contract in Alterman Tr. also required the target corporation to maintain a certain net worth. Id. at *18. The terms of the share purchase agreement and the escrow agreement do not dissuade us from our finding that the Sequoia loans were shams. Nor does the stipulated $35 million deposit. Accordingly, we find that the Sequoia loans were shams, for the reasons stated above, and petitioners received a transfer from Holiday Bowl in the MidCoast transaction. We will address respondent's alternative argument for petitioners' transferee liability.

**[*45]**     2.     <u>De Facto Liquidation of Holiday Bowl</u>

Respondent alternatively argues that the Court should recharacterize the MidCoast transaction as a complete liquidation of Holiday Bowl and a liquidating distribution to petitioners equal to the purported purchase price. He argues that the Court should apply the sham transaction or substance over form doctrine rather than the standard for collapsing transactions as this Court and the Courts of Appeals have done in other transferee liability cases that involve the Uniform Fraudulent Transfer Act (UFTA) from other States with provisions similar to TUFTA's. In other such UFTA cases, we have collapsed the transactions at issue where the transferee had actual or constructive knowledge of the entire scheme that rendered the transfer fraudulent under State law. <u>Salus Mundi Found. v. Commissioner</u>, 776 F.3d at 1020 (NY UFCA at issue); <u>Diebold Found., Inc. v. Commissioner</u>, 736 F.3d at 187 (NY UFCA); <u>Starnes v. Commissioner</u>, 680 F.3d at 433 (North Carolina UFTA); <u>Slone v. Commissioner</u>, T.C. Memo. 2016-115 (Arizona UFTA); <u>Alterman Tr. v. Commissioner</u>, T.C. Memo. 2015-231 (Florida UFTA); <u>Tricarichi v. Commissioner</u>, T.C. Memo. 2015-201 (Ohio UFTA); <u>cf. Feldman v. Commissioner</u>, 779 F.3d at 459-460 (finding knowledge of scheme not required under Wisconsin UFTA). Respondent argues that TUFTA does not require knowledge of the tax scheme to recharacterize the transaction as a transfer

**[\*46]** subject to TUFTA and argues, in the alternative, that petitioners had the requisite knowledge.  TUFTA does not require the transferee to have knowledge of the statutory elements of constructive fraud, i.e., the transferor's insolvency or the lack of reasonably equivalent value.  Accordingly, respondent argues that knowledge of the entire scheme is not relevant when applying equitable principles to recharacterize a transaction as a transfer subject to TUFTA.

TUFTA does not provide any guidance as to whether it is appropriate to consider a transferee's knowledge when applying equitable principles to recharacterize a transaction as a transfer.  Tennessee caselaw does not set forth a specific test or detailed analysis that we can use to apply equitable principles to recast a transaction under TUFTA or to determine whether knowledge, either actual or constructive, is required before we recast a transaction for purposes of TUFTA.  We are instructed by cases from other jurisdictions that have enacted the UFTA.  TUFTA instructs the courts to apply its provisions to effect its general purpose to make uniform the law among the States that have enacted the UFTA. Tenn. Code Ann. sec. 66-3-312.  This Court and Courts of Appeals have imposed a knowledge requirement under State law before applying equitable principles to treat an alleged transferee as, in substance, having received a transfer in situations where there was no transfer in form.  Salus Mundi Found. v. Commissioner, 776

[*47] F.3d at 1020; Diebold Found., Inc. v. Commissioner, 736 F.3d at 187; Starnes v. Commissioner, 680 F.3d at 433; Slone v. Commissioner, T.C. Memo. 2016-115; Alterman Tr. v. Commissioner, T.C. Memo. 2015-231; Tricarichi v. Commissioner, T.C. Memo. 2015-201; cf. Feldman v. Commissioner, 779 F.3d at 459-460 (finding knowledge of scheme is not required under Wisconsin law); Weintraut v. Commissioner, T.C. Memo. 2016-142 (finding knowledge is not required under Indiana law but also holding that the transferee had knowledge assuming that State law required such knowledge). As we find that petitioners' advisers had sufficient knowledge for us to recast the MidCoast transaction as a transfer subject to TUFTA, we do not address respondent's argument that such knowledge is not required under State law.

Assuming knowledge is required to recharacterize the MidCoast transaction under State law, respondent must prove that petitioners had actual or constructive knowledge that MidCoast would cause Holiday Bowl to fail to pay its 2003 income tax. Constructive knowledge is either knowledge that ordinary diligence would have elicited, where the transferee was aware of circumstances that should have led the transferee to inquire further into the circumstances of the transaction, sometimes referred to as inquiry knowledge, or a more active avoidance of the truth. Diebold Found., Inc. v. Commissioner, 736 F.3d at 187. We do not decide

[*48] which of these definition of constructive knowledge is appropriate because petitioners had constructive knowledge under either standard. Tennessee courts have considered inquiry notice as a variant of actual notice rather than a type of constructive notice, or a middle ground between constructive and actual notice. Blevins v. Johnson County, 746 S.W.2d 678, 683 (Tenn. 1988). Tennessee courts define inquiry notice as knowledge of facts and circumstances sufficient to put a reasonable person on notice and to charge that person with knowledge of all the facts and circumstances that a reasonably diligent and good-faith investigation would disclose. Id. (considering notice with respect to real property rights); Eldrige v. Savage, 2012 WL 6757941 (Tenn. Ct. App. Dec. 28, 2012) (considering notice relating to running of statute of limitations).

Petitioners knew from the outset that the underlying purpose of the MidCoast transaction was to obtain a financial benefit from the nonpayment of Holiday Bowl's 2003 income tax. Mr. Hansell introduced MidCoast as willing to pay a premium over Holiday Bowl's book value because MidCoast would not pay the tax on the gain from the asset sale and would pass a portion of the saving from the unpaid tax liability back to petitioners. By that time petitioners had decided to end their bowling alley business and planned to liquidate and distribute the proceeds from an asset sale. Instead of liquidating, they pursued the MidCoast

[*49] transaction to increase their after-tax proceeds from the asset sale. When the asset sale was delayed because of family litigation in chancery court, petitioners were aware of MidCoast's proposal and their advisers had begun discussions with MidCoast. Petitioners made the decision to reoffer the bowling alleys for sale in late May 2003 and to separately pursue the MidCoast transaction. Petitioners could have reconsidered the asset sale if their decision had been based on any purpose other than tax saving. They chose to engage in both transactions as a tax-avoidance strategy. From the beginning their advisers should have known "it seems to good to be true", as Mr. Hansell stated in his written correspondence introducing the MidCoast transaction. There were numerous red flags that should have raised the concerns of petitioners' advisers, including a purchase price above book value calculated on the basis of tax saving, the issues with the Sequoia loans discussed above, Notice 2001-16, supra, and using an interest-free demand loan to purchase a corporation holding only cash and tax liabilities.

While petitioners claim that MidCoast misrepresented its business plan and tax strategy, petitioners' advisers did not attempt to confirm MidCoast's representations. Petitioners' advisers did not request any documentation to verify MidCoast's representations. They contacted only references who were advisers involved in prior MidCoast deals who merely confirmed that MidCoast closed the

[*50] deals it started. They did not contact any references in the asset recovery business to determine MidCoast's reputation or whether MidCoast was in fact engaged in an asset recovery business. Cf. Slone v. Commissioner, at *16 (transferees knew MidCoast had a reputation for "hardball" collection tactics). Petitioners claim they believed MidCoast would continue Holiday Bowl as a going concern, but the record shows that they considered Holiday Bowl would exist as a "shell" for seven years. In addition, MidCoast's alleged tax strategy should have raised concerns for petitioners' advisers, especially in the light of Notice 2001-16, supra. Petitioners allege that MidCoast represented it would place Holiday Bowl into an asset recovery business and would employ a tax strategy to frontload expenses in the first 18 to 24 months of that business to offset Holiday Bowl's taxable gain and to defer payment of the 2003 tax. Holiday Bowl's alleged stand-alone asset recovery business would have existed for approximately six weeks in 2003 as the MidCoast transaction closed on November 18, 2003. It was not plausible on the basis of MidCoast's purported tax strategy that Holiday Bowl would incur offsetting expenses in an asset recovery business by yearend. Petitioners' advisers apparently ignored this fact, however, when they followed MidCoast's unverified representations. Petitioners' advisers should have known that a six-week asset recovery business would not generate sufficient losses for

[*51] Holiday Bowl to owe no tax in 2003. We also note that petitioners did not obtain a legal opinion with respect to MidCoast's purported tax strategy to frontload expenses in an asset recovery business.

Moreover, the share purchase agreement expressly stated that petitioners could not rely on MidCoast's representations made during the negotiation process. By contrast, the share purchase agreement in Alterman Tr. contained specific covenants that MidCoast would not dissolve the target for four years, MidCoast would reengineer the target into an asset recovery business, the target would invest a certain dollar amount in delinquent debt and would maintain a certain net worth for four years, and MidCoast represented it had a net worth over $10 million, an amount in excess of the target's tax liability. Alterman Tr. v. Commissioner, at *17-*18. Through these contractual provisions, the selling shareholders in Alterman Tr. attempted to ensure the target's tax would be paid. The transferee in Alterman Tr. successfully prosecuted a claim against MidCoast on the basis of the terms of the share purchase agreement. Id. at *32. Petitioners did not seek to include similar contractual provisions in the share purchase agreement in these cases. Rather than obtain this type of protection for their clients, petitioners' advisers relied on the indemnity from MidCoast, the parent guaranty, and the fact

[*52] that MidCoast had previously engaged in similar transactions. The advisers' due diligence is not sufficient to protect petitioners.

Irrespective of MidCoast's claimed tax strategy, we find Notice 2001-16, supra, a factor determining that petitioners should have known that MidCoast did not have a legitimate strategy to avoid or defer Holiday Bowl's 2003 income tax. Petitioners and their advisers were aware of Notice 2001-16, supra, and knew that the IRS had identified intermediary transactions similar to the MidCoast transaction as listed transactions that the IRS considered abusive tax shelters. Petitioners should have known that the IRS would scrutinize the MidCoast transaction on the basis of Notice 2001-16, supra. The advice letters from Chambliss Bahner and Johnson Hickey did not mention Notice 2001-16, supra, or discuss whether the MidCoast transaction was a listed transaction subject to recent IRS pronouncements. Mr. Snouffer was aware of Notice 2001-16, supra, and discussed it with the author of an article that proposed that having the asset sale occur first was enough of a differentiation from the listed transactions in the IRS pronouncement. There is nothing in the record to indicate how Mr. Snouffer came to the conclusion that Notice 2001-16, supra, did not apply or whether he in fact came to that conclusion. Petitioners did not obtain a tax opinion that analyzed the IRS pronouncement on listed transactions. Nevertheless petitioners were

[*53] concerned with transferee liability apparently on the basis of Notice 2001-16, supra. Petitioners' advisers knew there was a risk that the IRS would challenge MidCoast's purported tax strategy and that MidCoast's purported tax scheme would not work. The advisers discussed the transferee liability with petitioners. From the record it is apparent that the advisers' legal analysis was minimal and relied on the fact that MidCoast had engaged in similar transactions for a number of years without problems with the IRS.

Petitioners should have known that Holiday Bowl would be insolvent after the MidCoast transaction. MidCoast represented that it needed a loan to purchase a corporation with only cash and then would use the corporation's cash to purchase delinquent debt. Using a loan to purchase cash and tax liability should have raised serious concerns for petitioners' advisers. Holiday Bowl had no operating assets, no employees, and no business operations. Holiday Bowl decided to sell its assets and was in the process of winding up its affairs before petitioners learned of MidCoast. When "one purports to sell cash in corporation solution the burden is * * * particularly severe on the seller to show that the only purpose served is not tax avoidance." Owens v. Commissioner, 568 F.2d at 1239 (quoting Owens v. Commissioner, 64 T.C. at 15). Petitioners knew Holiday Bowl's cash secured the loans. The purported loans were payable on demand and

[*54] did not charge interest except in default. Holiday Bowl's cash was required as security for the loans but could not be used to both purchase the delinquent debt for an asset recovery business and repay the demand loan.

Petitioners knew that Holiday Bowl would not pay tax for 2003. We find no distinction between the nonpayment of the income tax in 2003 and the advisers' characterization of MidCoast's stated tax strategy as a deferral of tax as petitioners knew there was a likelihood that Holiday Bowl would be insolvent after 2003 and would exist as a shell. The adviser letters show that petitioners' advisers had knowledge that the result of the entire scheme of the MidCoast transaction was nonpayment of Holiday Bowl's 2003 income tax. MidCoast agreed to cause Holiday Bowl to pay the 2003 income tax only "[t]o the extent any portion of the Deferred Tax Liability is due to post-closing business activities". In the letter of intent, MidCoast had stated it would covenant to cause Holiday Bowl to pay 2003 tax to the extent due given Holiday Bowl's postclosing activities. MidCoast agreed to pay more than book value for Holiday Bowl stock because it planned not to pay Holiday Bowl's 2003 income tax and petitioners knew of the intended nonpayment. This should have raised serious concerns for petitioners' advisers especially in the light of the IRS pronouncements on listed transactions. Petitioners knew there was a risk of transferee liability, and they accepted the risk.

[*55] The knowledge requirement to recharacterize a transaction for purposes of transferee liability protects innocent creditors and purchasers for value. Diebold Found., Inc. v. Commissioner, 736 F.3d at 189. Petitioners knew that the MidCoast transaction was designed to let them avoid the tax due on the asset sale and to leave only a shell of a corporation without assets to satisfy its liabilities. Petitioners should have known through a commonsense examination of MidCoast's representations that MidCoast was purchasing Holiday Bowl's tax liabilities and would pay petitioners a premium above book value because MidCoast would not pay the tax. We find that the substance of the MidCoast transaction was a disguised liquidation to petitioners and petitioners knew, or should have known, that Holiday Bowl would fail to pay its 2003 tax.

C.    Advisers' Knowledge Imputed to Petitioners

Petitioners argue that the knowledge of an adviser is not imputed to taxpayers where the taxpayer did not have the education or experience to understand the tax implications of the transaction. We agree with petitioners that Mrs. Hawk did not have a sophisticated understanding of tax law, had limited education and business experience, and relied heavily on the expertise of her advisers, including her husband's longtime attorney, whom she trusted. Cf. Tricarichi v. Commissioner, at *12 (transferee was a sophisticated businessman

**[\*56]** who received advice that the tax strategy was a "very aggressive tax-motivated" strategy). She had no involvement in negotiating the terms of the MidCoast transaction or with assessing the risks associated with it. However, she understood that Holiday Bowl's income tax would not be paid for 2003. While she did not understand the tax strategy described by MidCoast or the intermediary structure of the MidCoast transaction, her advisers did. Similarly, AmSouth Bank, as cotrustee and coexecutor, relied on Chambliss Bahner and Johnson Hickey, deferred to Mrs. Hawk's decisions, and was not involved in negotiating with MidCoast or assessing the legitimacy of the MidCoast transaction.

To hold a transferee liable for unpaid tax, courts have looked to the knowledge of the selling shareholders' representatives rather than that of the shareholders' See Diebold Found., Inc. v. Commissioner, 736 F.3d at 188-189; Estate of Marshall v. Commissioner, T.C. Memo. 2016-119; Alterman Tr. v. Commissioner, T.C. Memo. 2015-231. In their argument against imputed knowledge, petitioners cite Alexander v. Commissioner, T.C. Memo. 2013-203. The Alexander case involved the 75% penalty for fraud under section 6663. In Alexander we held that a taxpayer's limited understanding of tax laws and reliance upon his or her attorney is a factor weighing against the finding of fraudulent intent for purposes of the 75% penalty. There is no legal basis to extend the

[*57] reasoning of <u>Alexander</u> with respect to imputed knowledge, as it relates to the fraud penalty, to the question of whether transferee liability exists. Moreover, petitioners' substantive liability for tax as transferees is determined under State law, not the Federal tax law at issue in <u>Alexander</u>. Accordingly, we impute the advisers' knowledge to Mrs. Hawk and the other petitioners.

D.    <u>TUFTA Application to Stock Redemption and MidCoast Transaction</u>

Petitioners received transfers from Holiday Bowl in the MidCoast transaction and the stock redemption for purposes of applying TUFTA. Accordingly, we must determine whether the transfers were fraudulent under TUFTA. A transfer is constructively fraudulent as to present creditors if: (1) the transferor did not receive reasonably equivalent value in the exchange and (2) the transferor became insolvent as a result of the transfer. Tenn. Code Ann. sec. 66-3-306(a).

1.    <u>Present Creditor at Time of Transfer</u>

Petitioners argue that the IRS was not a present creditor at the time of the MidCoast transaction and stock redemption because Holiday Bowl's 2003 income tax did not accrue until the end of the tax year, citing <u>Hagaman v. Commissioner</u>, 100 T.C. 180 (1993). We have held that the Commissioner becomes a creditor for Federal income tax liabilities when taxable gain is realized. <u>Kreps v.</u>

[*58] <u>Commissioner</u>, 42 T.C. at 670-671. Gain from the sale of corporate assets arises at the time the assets were sold; and the IRS claim for income tax on the gain from the sale of corporate assets arises at the time of the asset sale. <u>Id</u>; <u>see</u> <u>Feldman v. Commissioner</u>, 779 F.3d at 457-460 (discussing Wisconsin's UFTA). The decision in <u>Hagaman</u> does not require a different result. The transfers in <u>Hagaman v. Commissioner</u>, 100 T.C. at 185, occurred after the tax years at issue. The Court's holding assumed for purposes of the case that income tax is deemed due and owing at the end of the year regardless of whether the tax is assessed. The Court did not consider whether the IRS may become a creditor at an earlier time. <u>Id.</u> at 185. We have previously held that income tax liability arising from the sale of corporate assets is a claim arising at the time of the asset sale. <u>Estate of Marshall v. Commissioner</u>, T.C. Memo. 2016-119; <u>Cullifer v. Commissioner</u>, T.C. Memo. 2014-208. Petitioners further argue the enactment of section 6151 requires us to reconsider this legal conclusion. Section 6151 establishes that tax is due upon filing of a return. It defines a payment due date, not the existence of a claim. Section 6151 is not relevant to determining whether respondent is a present creditor in these cases.

Income tax liability is a claim as defined by TUFTA. TUFTA defines the term "claim" broadly as any "right to payment, whether or not the right is reduced

[*59] to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured".  Tenn. Code Ann. sec. 66-3-302(3).  A claim includes tax liabilities arising from an asset sale even if payment is not yet due.  Estate of Marshall v. Commissioner, T.C. Memo. 2016-119.

Holiday Bowl's 2003 tax liability arose, in substantial part, from two events:  the asset sale and the stock redemption.  Respondent's claim arose on the dates of the asset sale, July 1, 2003, and the stock redemption, November 12, 2003.  Respondent became a creditor on those dates and thus was a present creditor on the date of the MidCoast transaction, November 12, 2003.[17]

    2.    Reasonably Equivalent Value

TUFTA does not define the phrase "reasonably equivalent value".  The Court of Appeals for the Sixth Circuit has instructed that the Court should first determine whether the debtor received any value and, if so, whether the value received was reasonably equivalent to that of the transferred asset.  Stoats v. Butterworth Props, Inc. (In re Humble), 19 F. App'x 198, 200 (6th Cir. 2001).  Whether Holiday Bowl received reasonably equivalent value is a question of fact.

---

[17]Petitioners also received a transfer with respect to the portion of the purchase price used to pay their attorney's and accountant's fees.  See Tenn. Code Ann. sec. 66-3-309(b)(1); Fibel v. Commissioner, 44 T.C. 647, 658 (1965).

**[\*60]** <u>See</u> <u>Shockley v. Commissioner</u>, T.C. Memo. 2015-113, <u>aff'd</u>, 872 F.3d 1235 (11th Cir. 2017); <u>Hirsch v. Steinberg (In re Colonial Realty Co.)</u>, 226 B.R. 513, 523 (Bankr. D. Conn. 1998). Value is determined from the perspective of a creditor. <u>Stoner v. Amburn</u>, 2012 WL 4473306, at \*11. The Court of Appeals for the Sixth Circuit has addressed the meaning of "reasonably equivalent" as that phrase is used in the Bankruptcy Code, 11 U.S.C. sec. 548(a)(1)(B)(i). TUFTA is substantially similar to the relevant parts of the Bankruptcy Code. <u>See</u> 11 U.S.C. sec. 548(a)(1)(B). The Bankruptcy Code does not define the phrase. <u>See</u> <u>Congrove v. McDonald's Corp. (In re Congrove)</u>, 222 F. App'x 450, 454 (6th Cir. 2007). The Court of Appeals for the Sixth Circuit Bankruptcy Appellate Panel has stated that value is viewed on the basis of the consideration received by the debtor and the net effect of the transfer on the value of the debtor's estate, i.e., the funds available to creditors after the transfer, rather than the value given by the transferee. <u>Id.</u> The unsecured creditor should be no worse off. <u>Id.</u> The test used to determine reasonably equivalent value compares the value of the property surrendered with the value of the property received. <u>Corzin v. Fordu (In re Fordu)</u>, 201 F.3d 693, 707-708 (6th Cir. 1999); <u>Webb v. Exec. Realty P'ship, L.P. (In re Webb Mtn., LLC)</u>, 420 B.R. 418, 433 (Bankr. E.D. Tenn. 2009).

[*61] Petitioners contend that Holiday Bowl received its own stock in exchange for Snow Hill Road. Respondent argues that the redeemed shares had no value because Holiday Bowl was insolvent on the redemption date. When a corporation is insolvent at the time of a stock redemption, the corporation generally receives nothing of value from the return of the stock as the stock is valueless to the corporation. Consove v. Cohen (In re Roco Corp.), 701 F.2d 978, 982 (1st Cir. 1983). However, courts will look to other value that a corporation may receive in conjunction with the stock redemption when the corporation is insolvent, such as release of a claim or waiver of rights, to find reasonably equivalent value. Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation, Inc.), 57 B.R. 195, 199 (Bankr. N.D. Ga.1986) (a minority shareholder's waiver of his right to dissent to a proposed sale of the corporation's assets may constitute reasonably equivalent value); Shaps v. Just Enough Corp. (In re Pinto Trucking Serv. Inc.), 93 B.R. 379, 388 (Bankr. E.D. Pa. 1988) (release of legal claims against corporation and other shareholders may constitute reasonably equivalent value). The redemption here was not for reasonably equivalent value. Petitioners have not identified anything of value that Holiday Bowl received in the redemption. The redemption did not change the respective ownership interests in Holiday Bowl. Furthermore, as the MidCoast transaction was a disguised liquidating distribution

[*62] from Holiday Bowl to petitioners, we find that Holiday Bowl did not receive any value in the transaction.

### 3. Insolvency

The TUFTA constructive fraud provision at issue requires the debtor to be insolvent at the time of the transfer or to become insolvent as a result of the transfer. Tenn. Code Ann. sec. 66-3-306(a). A debtor is insolvent under TUFTA if the sum of its debts is greater than its assets at a fair valuation. Id. In addition, a debtor that fails to pay its debts as they become due is presumed to be insolvent. Id. sec. 66-3-303(b). Insolvency may be measured after a series of related transfers that in total leave the transferor insolvent. Botz v. Helvering, 134 F.2d 538, 543 (8th Cir. 1943), aff'g 45 B.T.A. 970 (1941); Still v. Fuller (In re Sw. Equip. Rental, Inc.), 1992 WL 684872; see Hagaman v. Commissioner, 100 T.C. 180; Gumm v. Commissioner, 93 T.C. 475, 480 (1989), aff'd without published opinion, 933 F.2d 1014 (9th Cir. 1991).

The stock redemption rendered Holiday Bowl insolvent only if considered in conjunction with the MidCoast transaction. After the stock redemption, without considering the MidCoast transaction, Holiday Bowl would have held approximately $4.2 million in assets and $1.2 million in tax liabilities with a net asset value of $3 million. However, the stock redemption was part of a series of

[*63] transactions that led to Holiday Bowl's insolvency. The redemption and the MidCoast transaction are sufficiently related that we can measure the effect of both events on Holiday Bowl's solvency together. Petitioners treated the redemption and the MidCoast transaction as one event for purposes of State tax law. The share purchase agreement deemed the MidCoast transaction and the redemption to occur simultaneously. They were planned to occur together and in fact occurred on the same day. See Weintraut v. Commissioner, T.C. Memo. 2016-142. Petitioners would not have engaged in the redemption if the MidCoast transaction had not closed. Rather Ms. Colletti advised distributing Snow Hill Road in a liquidating distribution if the MidCoast transaction did not take place. The redemption and the MidCoast transaction were part of the same event: a distribution of assets in complete liquidation.

Respondent did not concede that Holiday Bowl was solvent after the stock redemption, as petitioners argue, on the basis of the stipulation of Holiday Bowl's balance sheet dated November 7, 2003, that did not list Snow Hill Road as a corporate asset. Petitioners suggest that Holiday Bowl was not insolvent on the basis of the funds held in the Delta Trading account, arguing that either Holiday Bowl retained ownership of the money held in this account or the transfer repaid the Sequoia loans. The MidCoast transaction paid out $3.45 million of Holiday

[*64] Bowl's assets to petitioners, leaving Holiday Bowl with approximately $700,000 in cash and $1.2 million in Federal and State tax. If we stop here, Holiday Bowl was insolvent; but additional transfers were made to MidCoast of approximately $320,000.

We hold that petitioners are subject to substantive liability under TUFTA on the basis of constructive fraud because they received Snow Hill Road and a liquidating distribution from Holiday Bowl without giving reasonably equivalent value in exchange for the distributions. Those distributions resulted in Holiday Bowl's insolvency. Respondent's claim for the 2003 tax arose before the distributions. Accordingly, we find that petitioners are liable for Holiday Bowl's 2003 tax under the constructive fraud provision of Tenn. Code Ann. sec. 66-3-306.

## II.    Transferee Liability Under Section 6901

For purposes of section 6901, the term "transferee" includes a donee, heir, legatee, devisee, distributee, or shareholder of a dissolved corporation. Sec. 6901(h); sec. 301.6901-1(b), Proced. & Admin. Regs. The principles of substance over form discussed above apply to determinations of transferee liability under Federal tax law. The MidCoast transaction served no business purpose other than to avoid tax and to disguise payment as coming from any entity other than Holiday Bowl. The financial benefit to petitioners or MidCoast is derived solely from the

[*65] nonpayment of tax. The MidCoast transaction had no economic effect except for tax saving. The objective economic reality shows that the MidCoast transaction was a liquidating distribution. Petitioners are transferees of Holiday Bowl under section 6901. Under section 6902(a) petitioners bear the burden of proving that Holiday Bowl is not liable for the underlying tax liability or is liable for a reduced amount. See Rule 142(d). Petitioners have not challenged the underlying tax liability.

The marital trusts received transfers from the estate and are liable as successive transferees under TUFTA and section 6901. The trusts provided no value to the estate in exchange for the transfers. Judgment may be entered against successive transferees for the value of the transferred assets or the amount needed to satisfy the creditor's claim, whichever is less. Tenn. Code Ann. sec. 66-3-309(b)(2).

## III. Reasonable Collection Efforts

Petitioners argue that they are not liable as transferees because respondent failed to make reasonable efforts to collect the 2003 tax from Holiday Bowl. State law determines the Commissioner's obligation to pursue collection efforts against a transferor before proceeding against a transferee. Hagaman v. Commissioner, 100 T.C. at 183-184; Kardash v. Commissioner, T.C. Memo. 2015-51, at *22.

**[*66]** TUFTA does not require a creditor to pursue collection efforts against a transferor as a prerequisite to transferee liability.

Any additional collection efforts against Holiday Bowl would have been futile. See Zadorkin v. Commissioner, T.C. Memo. 1985-137. The reasonableness of collection efforts depends on the facts of each case. Cullifer v. Commissioner, at *73. Respondent completed his investigation into collection potential against Mrs. Hawk before completing his investigation of Holiday Bowl and before issuing a notice of deficiency or assessing tax against Holiday Bowl. An IRS revenue officer spent only six hours on his initial investigation before submitting his collection reports. After the tax assessment against Holiday Bowl, respondent conducted another investigation. The IRS searched property and corporate records in Tennessee and Nevada (the two States of Holiday Bowl's incorporation) for Holiday Bowl assets and found none, obtained a business report, searched internal databases, visited the last address available for Holiday Bowl, and filed notices of Federal tax lien in Nevada and Tennessee. The IRS confirmed with the Corley family that Holiday Bowl had sold its operating assets in 2003, filed its final return for 2005, and dissolved in 2006. In fact, Holiday Bowl was insolvent by the end of 2003. Respondent determined that Holiday

[*67] Bowl did not have any assets from which to collect tax and made a reasonable collection effort.

Petitioners also argue that respondent cannot pursue transferee liability against them because respondent did not pursue transferee liability against MidCoast or Sequoia. They cite no authority for the argument that respondent must pursue all potential transferees. Transferee liability is several under section 6901. Alexander v. Commissioner, 61 T.C. 278, 295 (1973). We have held that the Commissioner may proceed against any or all transferees in no particular order. Cullifer v. Commissioner, at *74.

IV.    Transferee Liability for Penalty

Respondent assessed a section 6662(h) 40% penalty against Holiday Bowl for 2003 for a gross valuation misstatement relating to the claimed loss deductions. Transferee liability under section 6901 can include related additions to tax, penalties, and interest owed by the transferor. Kreps v. Commissioner, 42 T.C. at 670. Petitioners rely on Stanko v. Commissioner, 209 F.3d 1082 (8th Cir. 2000), rev'g T.C. Memo. 1996-530, to argue that a transferee is not liable for a penalty on the basis of conduct that occurred after the transfer unless the Commissioner proves the transferee's fraudulent intent. Id. at 1088. Petitioners

[*68] argue that the deficiency resulted from option transactions that occurred in December 2003.

We have previously rejected similar arguments. See Estate of Marshall v. Commissioner, T.C. Memo. 2016-119; Tricarichi v. Commissioner, T.C. Memo. 2015-201. Stanko involved pre-UFTA law that defined fraudulent conveyances and held that because the penalty did not exist at the time of the transfer, the creditor must prove intent to defraud subsequent creditors. TUFTA's definition of "claim" is expansive and includes unmatured and unliquidated claims, including the penalty here regardless of whether the penalty existed at the time of the transfer. Furthermore, the facts here would support a finding of constructive fraud under the two TUFTA provisions applicable to future creditors that were enacted after Stanko and do not require proof of fraudulent intent.[18] See Tenn. Code Ann. sec. 66-3-305(a)(2).

_____

[18]Tenn. Code Ann. sec. 66-3-305(a)(2) also imposes transferee liability for constructive fraud, requires the same evidence of an exchange of reasonably equivalent value, and applies to both present and future creditors; however, instead of insolvency, it requires evidence that either: (1) the debtor was engaged or was about to engage in a business or a transaction for which the debtor's remaining assets were unreasonably small in relation to the business or transaction or (2) the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Id. sec. 66-3-305(a)(2)(A) and (B).

**[*69]** We look to State law to determine whether there is a basis to relieve petitioners of transferee liability for the accuracy-related penalty. Under TUFTA, a creditor may recover the lesser of: (1) the value of the asset transferred, subject to adjustments or (2) the amount necessary to satisfy the creditor's claim. Id. sec. 66-3-309(b). Where transferee liability is based on the value of the asset, value is determined at the time of the transfer subject to adjustment as equities may require. Id. sec. 66-3-309(c). The transfers to Mrs. Hawk and the exempt trust were less than the IRS claim against Holiday Bowl so their liability is limited to the value of the transferred assets. We have discretion to reduce the judgment against the exempt trust and Mrs. Hawk as equities warrant. See id. sec. 66-3-309(c). Such relief is appropriate with respect to the penalty.

Mrs. Hawk relied on her husband's longtime attorney. Mrs. Hawk did not understand the complexity of the tax law applicable to either the asset sale or the MidCoast transaction. Mrs. Hawk was a homemaker for her nearly 50-year marriage and did not have business experience. AmSouth's trust officer also relied on professionals, initially did not want to pursue the transaction, was not involved in negotiations, and generally deferred to Mrs. Hawk's decisions. Petitioners received only slightly more than Holiday Bowl's book value. They

[*70] gave up corporate stock with a book value of $3 million and received a liquidating distribution of $3.45 million.

When the transferred assets exceed the amount of the creditor's claim, the transferee is liable for the full amount of the creditor's claim, and TUFTA does not provide for equitable adjustments. Tenn. Code Ann. sec. 66-3-309(a). The estate and the nonexempt trust received transfers in excess of the amount of the IRS claim. We do not have discretion to adjust their liability for equitable considerations. Accordingly, we find the estate and the nonexempt trust are liable for the accuracy-related penalty against Holiday Bowl. Petitioners also seek to reduce any transferee liability attributable to their status as beneficiaries of the estate (the exempt and nonexempt trusts) by their estate tax liabilities on the transfers from the estate, citing Estate of Cury v. Commissioner, 23 T.C. 305, 341-342 (1954). Transferee liability is measured by the value of assets received, reduced by the value of liabilities assumed by the transferee. Id. Respondent did not object to this computation in his briefs.

V.    Petitioners' Liability for Interest

Petitioners argue that we should not hold them liable for prejudgment interest because prejudgment interest is discretionary under Tennessee law and depends on the equities of the case. See Tenn. Code Ann. sec. 47-14-123. Under

[*71] Federal tax law, interest in transferee liability cases is calculated in two separate periods, prenotice and postnotice; the applicable notice is the notice of transferee liability. Prejudgment interest (a State law term) includes prenotice interest and a portion of the postnotice interest. The postnotice interest period begins on the issuance of the notice of transferee liability and ends when the tax is paid in full. Estate of Stein v. Commissioner, 37 T.C. 945, 959 (1962). Postnotice interest (including the portion that is prejudgment) is determined under Federal law and applies regardless of the value of the transferred asset. We hold that each petitioner is liable for postnotice interest pursuant to section 6601(a).

A transferee's liability for prenotice interest depends on the value of the assets the transferee received. If the transferee received assets valued at less than the IRS claim, State law governs liability for prenotice interest, including the applicable rate. Lowy v. Commissioner, 35 T.C. 393, 395 (1960). Interest begins no earlier than the transfer date. Id. If the transferee received assets valued in excess of the IRS claim, prenotice interest begins on the due date of the transferor's tax and ends upon issuance of the notice of transferee liability, and Federal law determines the transferee liability for interest. Estate of Stein v. Commissioner, 37 T.C. at 961.

**[\*72]** A.    <u>Mrs. Hawk's and the Exempt Trust's Liability for Prenotice Interest</u>

Since Mrs. Hawk and the exempt trust received transfers of less than

Holiday Bowl's 2003 tax, penalty, and interest, Tennessee law determines their

liability for prenotice interest.  Under Tennessee law, the award of prejudgment

interest is discretionary and depends upon the equities of the case.  Tenn. Code

Ann. sec. 47-14-123; <u>McDonald v. Morgan (In re Morgan)</u>, 415 B.R. 644, 651

(Bankr. E.D. Tenn. 2009).  The purpose of prejudgment interest is to compensate

the IRS for loss of the use of the funds.  <u>Baptist Physician Hosp. Org., Inc. v.

Humana Military Healthcare Serv.</u>, 415 F. Supp. 2d 835 (E.D. Tenn. 2006).

Courts may award prejudgment interest where the transferee had full access to and

use of the money pending the case, and the IRS has not otherwise been

compensated for the loss of the use of the funds.  Courts have considered other

equitable factors to determine whether prejudgment interest is appropriate

including:  whether the amount owed was easily ascertainable before judgment,

whether the transferee had reasonable grounds to dispute transferee liability, and

whether there were unreasonable delays in the case.  <u>Myint v. Allstate Ins.</u>, 970

S.W.2d 920, 927-928 (Tenn. 1998); <u>Dog House Invs., LLC. v. Teal Props., Inc.</u>,

448 S.W.3d 905 (Tenn. Ct. App. 2014); <u>Wilder v. Tenn. Farmers Mut. Ins. Co.</u>,

912 S.W.2d 722, 727 (Tenn. Ct. App. 1995) (prejudgment interest inequitable

**[\*73]** where the defendant had reasonable defense against claim and lawsuit extended because of court delays); <u>BancorpSouth Bank v. 51 Concrete, LLC</u>, 2016 WL 1211433 (Tenn. Ct. App. Mar. 28, 2016) (prejudgment interest proper where there were no reasonable grounds to dispute the debt).

With respect to Mrs. Hawk and the exempt trust, we must determine whether prenotice interest is appropriate and if judged appropriate, set a date that prenotice interest begins to accrue to achieve an equitable result. We find that Mrs. Hawk and the exempt trust are not liable for prenotice interest on the basis of the equities. While they had use of the funds and the amount was easily determinable, delays outside these petitioners' control factor into our decision to relieve them from liability for prenotice interest. Petitioners filed informal discovery in 2010 and interrogatories in 2011. Respondent failed to provide a significant portion of the documentary evidence that he had in his possession until 2013, and petitioners filed a motion to compel respondent to answer interrogatories in January 2014. In 2011 respondent sought a stay in these cases because of a pending criminal case against MidCoast representatives that did not involve petitioners. As transferees, petitioners had a disadvantage as they did not control the filing of the tax return, the tax payment, or the tax documentation for

**[*74]** the underlying tax liability.  Under these circumstances, we will not award respondent prenotice interest with respect Mrs. Hawk and the exempt trust.

B.    Exempt Trust and the Estate's Liability for Prenotice Interest

Federal law controls the liability of the nonexempt trust and the estate for prenotice interest because both petitioners received assets valued in excess of the IRS claim.  No equitable considerations are available to relieve the estate or the nonexempt trust of liability for prenotice interest under Federal law.  Accordingly we hold that the nonexempt trust and the estate are liable for prenotice interest.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned above, we conclude that they are moot, irrelevant, or without merit.

To reflecting the foregoing,

Decisions will be entered under

Rule 155.